**SGI AIR HOLDINGS II LLC, a limited liability company organized under the laws of the state of Delaware, Plaintiff,**

v.

**NOVARTIS INTERNATIONAL AG, a foreign corporation with its principal place of business located in Switzerland, and Novartis AG, a foreign corporation with its principal place of business located in Switzerland, Defendants.**

No. CIV.A. 01–WY–1983–CB (BNB).

United States District Court,
D. Colorado.

Jan. 9, 2003.

Walter W. Garnsey, Jr., David Richard Fine, Kelly/Haglund/Garnsey & Kahn LLC, Denver, CO, Andrew Keith Solow, Kaye Scholer, LLP, New York City, for defendants.

Michael H. Berger, Scot Melvin Peterson, Koff, Corn & Berger, PC, Denver, CO, for plaintiff.

## ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS

BRIMMER, District Judge.

This case arises out of a breach of contract claim made by Plaintiff, SGI Air Holdings II LLC, against Defendants, Novartis International AG and Novartis AG, relating to the sale of an airplane. The case is before the Court on Defendants' Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Fed.R.Civ.P.

12(b)(2). After reading the briefs, hearing oral argument, and being fully advised of the premises, the Court **FINDS** and **ORDERS** as follows:

### Statement of Parties and Jurisdiction

Plaintiff SGI Holdings II LLC ("SGI") is a Delaware limited liability company. SGI's principal place of business is in Denver, Colorado. Defendant Novartis AG is a Swiss holding company with its principal place of business in Basel, Switzerland. Defendant Novartis International AG is a Swiss corporation with its principal place of business in Basel, Switzerland. Novartis International AG manages the day-to-day activities of Novartis AG.

Plaintiff asserts that jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, based on diversity of citizenship of the parties. The amount in controversy exceeds $75,000. As discussed below, Defendants contend that the Court lacks personal jurisdiction over them.

### Background

This is a breach of contract case. In the summer of 2001, Marino Buser, Novartis International AG's Head of Purchasing, whose office is in Basel, Switzerland, retained Aerospace Concepts of Canada ("Aerospace") to act as a broker for the negotiation and potential purchase of a corporate jet aircraft. Aerospace assigned Thomas Chapman, whose office is in Savannah, Georgia, to be the primary broker on the deal. Chapman found an advertisement from Plaintiff in his files and also looked at an internet advertisement for the Bombardier Global Express Jet Aircraft ("Aircraft"), owned by Plaintiff.

In the course of his investigation, Chapman found that the Aircraft was built in Canada and then shipped to Seattle, Washington for completion of the interior. An Aerospace employee inspected the Aircraft at the facility in Seattle, where the Aircraft remained during the period of time applicable for the purposes of this case. The Aircraft itself was never in Colorado.

On June 27, 2001, Mr. Buser, in Basel, authorized Chapman to submit a written offer to Plaintiff for the Aircraft. Chapman did so by fax from his office in Savannah, Georgia. The offer was sent to J. Mesinger Corporate Jet Sales, Inc. ("Mesinger"), Plaintiff's Colorado-based broker and agent. On June 30, 2001, Mesinger, acting on behalf of Plaintiff, responded with a counteroffer sent by fax to Buser in Switzerland. The counteroffer listed a price of $42 million for the Aircraft, subject to terms and conditions as listed in the counteroffer, including an initial $10 million deposit to be put "in a mutually agreeable U.S. aircraft escrow service" that was not necessarily in Colorado. On July 2, 2001, Mr. Buser signed the counteroffer on the line entitled "accepted" and faxed it back to Mesinger. Ten days later, Novartis International AG's attorney, George Miller, faxed Mesinger a letter from Switzerland that indicated that Novartis International AG did not wish to proceed with the purchase and that they would not be making the initial deposit as required in the counteroffer.

Plaintiff brought this suit alleging that Novartis International AG, on behalf of its parent corporation, Novartis AG, breached the contract for the purchase of the Aircraft and is liable for damages resulting from the breach. Defendants moved to dismiss for lack of personal jurisdiction and failure to state a claim upon which relief can be granted. Defendants asserted that neither Novartis International AG nor Novartis AG: (1) owns or leases any property in Colorado; (2) has any officer or employees in Colorado; (3) is authorized, qualified, or registered to do business in Colorado; (4) has a registered agent for service in Colorado; (5) has oth-

erwise consented to the exercise of personal jurisdiction by the courts of Colorado; or (6) has insured any person, property, or risk in Colorado. In an Order dated March 21, 2002, this Court found that it lacked personal jurisdiction over Defendants and accordingly dismissed Plaintiff's claim. It therefore found that Defendants' motion to dismiss for failure to state a claim was moot, and thus the Court did not reach the merits of the claim.

Subsequently, Plaintiff filed a motion to alter or amend the judgment, which the Court granted. The Court gave Plaintiff leave to conduct limited discovery on the subject of the possibility of an agency relationship between Defendants and their Colorado subsidiaries or an alter ego theory in order to establish personal jurisdiction. Defendants' motion to dismiss is again before the Court. Plaintiff is asking the Court to reconsider its former Order granting Defendants' motion to dismiss and to deny the motion in its entirety in light of the new facts established through discovery. The additional facts have led this Court to reconsider its prior Order.

### Legal Standard

To establish personal jurisdiction in a diversity case, a plaintiff must show both that jurisdiction is proper under the forum state's long-arm statute and that exercise of personal jurisdiction over the defendant comports with the Due Process Clause of the United States Constitution. *See Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1357 (10th Cir.1990). For the first step of the analysis, the Court turns to Colorado's long-arm statute, which establishes personal jurisdiction over defendants who, either in person or by an agent, engage in various activities within the state, including the transaction of business. *See* Colo. Rev.Stat. § 13–1–124(1)(a)–(b) (1999). Under Colorado law, this Court may exercise personal jurisdiction to the full extent of the Due Process Clause of the Fourteenth

Amendment. *See Dart Int'l, Inc. v. Interactive Target Sys., Inc.*, 877 F.Supp. 541, 543 (D.Colo.1995) (citing *Safari Outfitters, Inc. v. Superior Court*, 167 Colo. 456, 448 P.2d 783 (1968)).

Therefore, the Court's analysis collapses into a single inquiry as to whether the exercise of personal jurisdiction over the defendant comports with due process. This analysis is guided by federal law. *Nat'l Bus. Brokers, Ltd. v. Jim Williamson Prods., Inc.*, 115 F.Supp.2d 1250, 1253 (D.Colo.2000), *aff'd*, 16 Fed.Appx. 959 (10th Cir.2001); *see also Cubbage v. Merchent*, 744 F.2d 665, 667 (9th Cir.1984). "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). To comport with due process limitations, a court may exercise personal jurisdiction only over defendants that have "certain minimum contacts [with the jurisdiction] ... such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).

This minimum contacts standard may be satisfied in either of two ways—general jurisdiction or specific jurisdiction. *See Kuenzle v. HTM Sport–Und Freizeitgerate AG*, 102 F.3d 453, 455 (10th Cir.1996). The district court's duty is the same in exercising either general or specific jurisdiction: it must guarantee that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct.

559, 62 L.Ed.2d 490 (1980) (quoting *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154). This Court has previously ruled that specific jurisdiction does not exist in this case. *SGI Air Holdings II LLC v. Novartis Int'l AG*, 192 F.Supp.2d 1195, 1204 (D.Colo. 2002). Plaintiff does not attempt to relitigate that issue. Therefore, the only remaining jurisdictional question is whether the Court has general jurisdiction over Defendants.

General jurisdiction, unlike specific jurisdiction, subjects a defendant to a court's personal jurisdiction even when the controversy is not related to the defendant's activities in the forum. Specifically, "when the cause of action does not arise out of or relate to the foreign corporation's activities in the forum State, due process is not offended by a State's subjecting the corporation to its *in personam* jurisdiction when there are sufficient contacts between the State and the foreign corporation." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). However, these contacts must be "continuous and systematic." *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1533 (10th Cir.1996) (quoting *Hall*, 466 U.S. at 415–16 & n. 9, 104 S.Ct. 1868).

To survive Defendants' Motion to Dismiss, Plaintiff must make a prima facie showing that this Court has personal jurisdiction:

> Where a defendant challenges a court's in personam jurisdiction, the plaintiff bears the burden of establishing personal jurisdiction over the defendant.... Prior to trial, however, when a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing.... The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affida-

vits.... If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party.

*Nat'l Bus. Brokers*, 115 F.Supp.2d at 1253 (quoting *Behagen v. Amateur Basketball Ass'n*, 744 F.2d 731, 733 (10th Cir.1984) (citations omitted)). Furthermore, "[w]hen ... a district court grants a motion to dismiss for lack of personal jurisdiction without conducting an evidentiary hearing, 'the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion.'" *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1295 (10th Cir.1999) (quoting *Trierweiler*, 90 F.3d at 1533).

█ Defendants argue that since the Court allowed jurisdictional discovery, Plaintiff "bears the burden of proving by a preponderance of the evidence that personal jurisdiction exists." *See Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990). The Court has been unable to find any such rule in the Tenth Circuit, and it declines to adopt it. Plaintiff, therefore, need only make a prima facie showing of personal jurisdiction.

### Analysis

I. *Agency Theory of General Jurisdiction*

█ Plaintiff has acknowledged that Novartis AG and Novartis International AG do not themselves have contact with Colorado. However, Novartis AG has five indirect subsidiaries that are authorized to conduct business in Colorado. (Pl.'s Supp. to Resp. Br. Regarding Defs.' Mot. to Dismiss for Lack of Personal Jurisdiction ("Pl.'s Supp."), at p. 2). One of these subsidiaries, Geneva Pharmaceuticals, Inc. ("Geneva"), is a Colorado corporation op-

erating a production facility in Broomfield, Colorado. (Pl.'s Supp., at p. 3). Plaintiff maintains that the contacts of the subsidiaries, and especially Geneva, may be imputed to Defendants for purposes of personal jurisdiction. As support for this contention, Plaintiff argues a general agency theory of personal jurisdiction. Under this theory, general jurisdiction exists because Novartis AG's Colorado subsidiaries, and particularly Geneva, transact business in Colorado which is in essence the business of Defendants. Thus, the business transacted by these "general agents" in Colorado should be regarded as business transacted by Defendants in Colorado, thus subjecting Defendants to personal jurisdiction in Colorado.

The Tenth Circuit has held that "when a foreign defendant carries on a continuous and systematic part of its general business in the forum state through its agents, that state's exercise of jurisdiction over an unrelated cause of action is reasonable and just." *Behagen,* 744 F.2d at 733 (citing *Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 438, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952)). Furthermore, "as all corporations must necessarily act through agents, a wholly owned subsidiary may be an agent and when its activities as an agent are of such a character as to amount to doing business of the parent, the parent is subjected to the in personam jurisdiction of the state." *Quarles v. Fuqua Indus., Inc.,* 504 F.2d 1358, 1364 (10th Cir.1974) (quoting *Curtis Publ'g Co. v. Cassel,* 302 F.2d 132, 137 (10th Cir.1962)).

In this Court's previous Order granting Defendants' Motion to Dismiss, the Court held that "absent some showing that Defendants exert some control over the day to day activities of Defendants' subsidiaries, or a showing of entanglement, this Court cannot base general jurisdiction of Defendants on the activities of their sub-

sidiaries." *SGI,* 192 F.Supp.2d at 1201. Furthermore:

> Plaintiff has shown that Defendants' subsidiaries maintain continuous and systematic contacts with Colorado, but has failed to show that Defendants exert control over the day to day activities of Defendants' subsidiaries, or that Defendants and its subsidiaries are otherwise entangled. Therefore, the Court cannot base general personal jurisdiction of Defendants in the activities of its subsidiaries and the Court does not have general personal jurisdiction over Defendants.

*Id.* at 1204. This Court required Plaintiff to demonstrate a stronger link between Defendants and their Colorado subsidiaries, so that it might reasonably infer that the subsidiaries were indeed transacting Defendants' business in Colorado. "The effort ... is to ascertain from the total facts the amount of actual control exercised by the parent over the internal affairs of its subsidiary, and if such control is adequately shown, the self-serving niceties of inter-corporate housekeeping are of minor significance." *Flank Oil Co. v. Continental Oil Co.,* 277 F.Supp. 357, 363 (D.Colo.1967).

Plaintiff distinguishes its general agency theory of personal jurisdiction from an alter ego theory of personal jurisdiction. In *Quarles,* the Tenth Circuit discussed the alter ego theory and then went on to discuss the agency theory, both with respect to personal jurisdiction. 504 F.2d at 1364. Explaining the Kansas alter ego theory, the Court stated that "[u]nder this doctrine, the corporate entity is disregarded and liability fastened on an individual who uses the corporation merely as an instrumentality to conduct his own personal business. The liability must arise from fraud or injustice perpetrated on third parties *dealing with the corporation.*" [1] *Id.*

---

1. Although the word "liability" is used, the context involves personal jurisdiction.

(internal citations omitted) (emphasis added). Given this articulation of the alter ego theory, it is evident why Plaintiff is not pursuing it: Plaintiff never had any dealings with Geneva. Regarding the agency theory, the Tenth Circuit stated that "as all corporations must necessarily act through agents, a wholly owned subsidiary *may be an agent* and when its activities as an agent are of such a character as to amount to *doing business of the parent*, the parent is subjected to the in personam jurisdiction of the state." *Id.* (quoting *Curtis Publ'g*, 302 F.2d at 137) (emphasis in original). Given the Tenth Circuit's language "an instrumentality to conduct his own personal business" in reference to the alter ego theory, and "doing business of the parent" in reference to the agency theory, it is difficult to see a significant distinction between the two theories for jurisdictional purposes. It appears that the only difference is that under the alter ego theory, the plaintiff and the corporate subsidiary must have actually had dealings from which the cause of action arose.

For purposes of personal jurisdiction, agency and alter ego, while different legal concepts, often depend on the same facts when parent and subsidiary corporations are involved. Particularly, facts concerning the amount of control exercised by the corporate parent over its subsidiary are relevant for both theories. Such control could be evidence that the subsidiary is the parent's alter ego because the subsidiary has no real separate corporate existence. Similarly, such control could be evidence that the subsidiary is the parent's agent because the subsidiary is conducting the "real" business of the parent, which is formally only a holding company. The objective of either theory is to establish that the parent company has the minimum contacts with the forum necessary to support a finding of general jurisdiction.

Plaintiff itself, while emphasizing that it does not argue the alter ego theory, cites authority such as *Flank Oil*, which is an "alter ego theory" case. *See* 277 F.Supp. at 360. Because both agency and alter ego theories often depend on the same type of evidence regarding day to day control or entanglement, the Court looks to cases such as *Flank Oil* regardless of which theory they concern, as long as the cases illustrate the degree of corporate control necessary for a court to exercise personal jurisdiction over the corporate parent.

## II. *Defendants' Control of Geneva*

Plaintiff identifies three main ways in which Defendants exercise day to day control over Geneva, or in which Defendants and Geneva are entangled: (1) capital investment decisions; (2) personnel decisions; and (3) business and management decisions.

### A. *Capital Investment Decisions*

One aspect of Defendants' control over Geneva can be seen in their promulgation of Guidelines for Capital Appropriation Requests ("CARs"), which impose a standard process on investment and divestment decisions, requiring that Novartis AG's subsidiaries evaluate specific information and obtain approval from outside the subsidiaries before the subsidiaries are permitted to invest their capital. (*See* Pl.'s Supp., Ex. E). CARs must be completed for purchases of real estate and patents, for large scale repairs to fixed assets, and for other projects and contracts. (*Id.*, at pp. GEN 0025–26). The amount of the CAR determines the approval authority required before the subsidiary can use its funds. (*Id.*, at p. GEN 0030). Geneva's "Terms of Reference" provide that Geneva's management may approve investments and divestitures up to one million Swiss francs, but the approval of Geneva's

Board of Directors is required for investments and divestitures exceeding that amount. (*See* Pl.'s Supp., Ex. G., at p. GEN 0016). However, investments of more than five million Swiss francs [2] must be approved by the Group Executive Management Committee of Novartis ("Executive Committee"), (Pl.'s Supp., Ex. C ("Wang Dep."), at 8:18–25; 9:1–3), which is "a body designated by the Board of Directors [of Novartis AG] to act on behalf of the board to execute the strategies and policies of *the company*." (Pl.'s Supp., Ex. B ("Walker Dep."), at 6:11–15) (emphasis added). Geneva's Board of Directors may approve the CAR only after the Executive Committee has approved it. (*See* Pl.'s Supp., at p. 7; Mem. of Defs. in Resp. to Pl.'s Supp. ("Defs.' Br."), McIntyre Dep., at 61:3–5).

Defendants point out that only once in the past thirty-two months preceding the filing of the Complaint in this action has the Executive Committee been called upon to approve a Geneva CAR. (Defs.' Br., at p. 5). Defendants argue that it is clear, therefore, that Novartis AG does not exercise day to day control over Geneva through its CAR approval powers. (*Id.*) However, the Court looks at the totality of the facts and will view Defendants' promulgation of standardized policies for all subsidiaries, direct and indirect, as a factor in determining personal jurisdiction. In *Flank Oil*, the District of Colorado took note of the fact that the subsidiary's financial reports and account procedures conformed to guidelines suggested by the parent in deciding that the parent exercised "effective and detailed control over [the subsidiary's] internal affairs." 277 F.Supp. at 360–61.

### B. *Personnel Decisions*

Defendants exercise approval authority over certain personnel decisions at Geneva. Norman Walker, Novartis International AG's head of human resources, conducted an employment interview of the Chief Executive Officer ("CEO") of Geneva Pharmaceuticals. (Walker Dep., at 18:6–8, 17–21). Mr. Walker routinely conducts interviews "to provide a perspective on potential candidates likely to be joining *the company*." (*Id.*, at 19: 17–22) (emphasis added). The final decision to hire the CEO was made by Dr. Oswald Sellemond, the Novartis representative to Geneva's Board of Directors, (Pl.'s Supp., at p. 8), and the person who requested that Walker conduct the interview, (Walker Dep., at 19: 7–8, 16).

The Executive Committee also appoints members to the Board of Directors of Geneva because those are senior appointments. (*Id.*, at 44:21–25, 45:1–7). Furthermore, Mr. Walker maintains personnel records for approximately one hundred of the top-level employees of Defendants' affiliates, including the CEO of Geneva. (*Id.*, at 22:15–23, 25:2–11). Salary recommendations for these employees come from the subsidiaries on an annual basis and are then reviewed by the chairman of Novartis International AG, with input from Walker. (*Id.*, at 24:7–24).

Mr. Walker apparently also has hiring approval over lower level employees at Geneva in the human resources area. On September 24, 2001, Walker interviewed an applicant for the position of Geneva's head of human resources at the request of Geneva's CEO. (*Id.*, at 62:14–25). The CEO *recommended* that the applicant be hired, and Walker agreed. (*Id.*, at 63:5–9).

---

**2.** According to recent exchange rates, five million Swiss francs is between 3.5 and 3.6 million United States dollars.

In *Flank Oil,* 277 F.Supp. at 360–61, the District of Colorado observed that: (1) the parent company effectively chose all of its subsidiary's directors; and (2) the parent designated one of its directors as the "Contact Director" and another as the alternate, to be consulted by the subsidiary's CEOs periodically, receive and evaluate information regarding the subsidiary's financial affairs and operating results, and make recommendations on important policy matters. These factors also exist in the present case. The Executive Committee appoints members of Geneva's Board of Directors because those are senior appointments. Furthermore, the role of Mr. Walker is in some ways similar to that of the "Contact Director" in *Flank Oil;* that is, he provides opinions on Geneva's hiring decisions, matters which are more "day to day" than "important policy matters."

Defendants cite many cases from other jurisdictions to persuade the Court that "the cases are uniform that a corporate parent's oversight of major personnel decisions does not, as a matter of law, evidence the requisite day-to-day control of a subsidiary sufficient to establish personal jurisdiction under any accepted theory." (Defs.' Br., at p. 9). Even if these cases were binding upon this Court, they would not affect this decision. The Court agrees with Defendants that a corporate parent's oversight, standing alone, is insufficient evidence of day to day control as a *matter of law.* However, Defendants' oversight may nevertheless be considered a factor, especially since it evidences Defendants' involvement in both major and minor personnel decisions.

### C. *Business and Management Decisions*

At the meeting of the Chairman's Committee of Novartis AG on September 21, 2000, Dr. Sellemond gave a status report concerning the year's results and "the strained business situation at Geneva."

(Pl.'s Supp., Ex. N). Dr. Sellemond reported that Geneva's results were behind those of the previous year as well as behind the targets for 2000. (Pl.'s Supp., Ex. N, at p. NOV 00028) (translated). Consequently, Dr. Sellemond proposed corrective measures, including the "[r]eorganization of development, sales, production and marketing as well as a reduction in the number of employees," a new management team, and other changes in the products and the core business of Geneva. (*Id.,* at p. NOV 00029) (translated). The Chairman's Committee agreed to the proposed measures. (*See id.*) (translated).

Another *Flank Oil* factor was that the Contact Director designated by the parent kept the parent's president and board of directors informed on the important activities of the subsidiary. 277 F.Supp. at 360–61. This role is similar to that of Dr. Sellemond, who was Novartis' representative to Geneva's Board of Directors and reported back to Novartis concerning the business activities of Geneva. Again, Defendants cite non-binding precedent for the proposition that such oversight is in accord with "the normal and expected role of a corporate parent." (Defs.' Br., at p. 11). The District of Colorado in *Flank Oil,* however, thought it was significant.

### III. *Geneva Conducting Novartis' Business*

The factors discussed above may or may not be sufficient to "pierce the corporate veil" under an alter ego theory of personal jurisdiction. *Compare Flank Oil,* 277 F.Supp. 357 (D.Colo.1967) (finding personal jurisdiction on alter ego theory), *with Quarles,* 504 F.2d 1358 (10th Cir.1974) (finding facts insufficient to establish alter ego theory of personal jurisdiction). However, the degree of control that has been demonstrated factors into a determination whether Geneva is "doing business of the

parent," *Quarles,* 504 F.2d at 1364 (quoting *Curtis Publ'g,* 302 F.2d at 137), and thus whether Geneva is Defendants' agent.

In *Quarles,* the plaintiff's agency theory failed because the parent was a holding company engaged in diversified corporate investments, and the subsidiary was a company operating adult vocational training schools. 504 F.2d at 1364. Thus, they were engaged in different businesses. "There was no agreement by which [the parent] assumed the risks of [the subsidiary's] business ventures." *Id.* Therefore, the Tenth Circuit distinguished that case from its predecessor, *Curtis Publishing,* 302 F.2d 132. In *Curtis,* the Tenth Circuit found that a wholly owned but independent subsidiary, a magazine distributor, was the agent of the parent, the publisher, because "circulation is the source of life to the magazine publisher," *id.* at 136, and the distributor had exclusive rights to solicit and sell the publisher's magazines. *Id.*

The present case is different from both *Quarles* and *Curtis.* In contrast to the parent company in *Curtis,* Novartis AG is a holding company; it does not actually manufacture or sell anything itself. (Walker Dep., at 31: 7–11). However, Novartis defines its own business as follows:

> We are a world leader both in sales and in innovation in our continuing core business: pharmaceuticals, generics, consumer health, eyecare products, and animal health. We aim to hold a leadership position in all of these businesses. We are committed to improving health and well-being through innovative products and services. The name "Novartis" is derived from the Latin novae artes, meaning "new skills," which reflects our focus on research and development.

(Pl.'s Supp., Ex. A, at p. 11). Thus, in contrast to the parent company in *Quarles,* Novartis AG is not engaged in diversified corporate investments. It has distinct and limited "core businesses." By its own statement, Novartis "operate[s] in five principle [sic] industry sectors," which mirror these core business areas. (*Id.*) Geneva's business is to manufacture "generics" (generic pharmaceuticals), one of these "core businesses." (*See id.,* at pp. 30, 65).

The relationship between Novartis and Geneva appears to be more similar to that between the publisher and distributor in *Curtis* than that between the holding company and vocational training school operator in *Quarles.* Novartis, although officially a holding company, is not engaged in the business of diversified corporate investments, as was the parent in *Quarles.* Rather, Novartis has defined five specific businesses in which it is a "world leader." Geneva carries out Novartis' business in one of these five areas, generics. Thus, Geneva's business is essential to Novartis' business, just as the distributor's business was the "source of life" to the publisher's business in *Curtis.* Consequently, Novartis has "assumed the risks" of Geneva's business ventures, unlike the relationship between the parent and the subsidiary in *Quarles.*

Based on the foregoing facts, this Court finds that Geneva is the general agent of Novartis, subjecting Novartis to personal jurisdiction in the District of Colorado. Furthermore, considering that the alternative to such a ruling appears to be that Plaintiff would have to take its claim to Switzerland, the Court believes that subjecting Defendants to jurisdiction in the District of Colorado would not offend "traditional notions of fair play and substantial justice." *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154.

## IV. *Motion to Dismiss for Failure to State a Claim*

■ Defendants' Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted was not addressed in

the prior Order due to the finding of lack of personal jurisdiction. However, because the Court finds that jurisdictional discovery has warranted a finding of personal jurisdiction, the Court will address this motion to dismiss. To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the plaintiff must allege facts that, if proven, would be sufficient to state a claim under the law. The court "accept[s] the well-pleaded allegations in the complaint as true and construe[s] them most favorably to the plaintiff. A complaint may be dismissed pursuant to Fed. R.Civ.P. 12(b)(6) only if the plaintiff can prove no set of facts to support a claim for relief." *Gonzales v. City of Castle Rock,* 307 F.3d 1258, 1261 (10th Cir.2002) (internal quotation marks and citations omitted).

Under Colorado law, "a party attempting to recover on a claim for breach of contract must prove the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *Western Distrib. Co. v. Diodosio,* 841 P.2d 1053, 1058 (Colo.1992) (internal quotation marks and citations omitted). Construed most favorably to Plaintiff, the Complaint has clearly alleged facts sufficient to support all of these elements. (*See* Cmpl. at ¶¶ 8–19). Therefore, Plaintiff has stated a claim for breach of contract under the law.

### Conclusion

For all the aforementioned reasons, Defendants' Motions to Dismiss pursuant to Fed.R.Civ.P. 12(b)(2) and 12(b)(6) are **DENIED.**