549 P.2d 623

**SCOTT GRAPHICS, INC., a corporation,**
**Plaintiff-Appellee,**

v.

**Evan MAHANEY and George Hensley, dba**
**Copy Machines, Defendants-Appellants.**

No. 2016.

Court of Appeals of New Mexico.

April 6, 1976.

David F. Boyd, Jr., Albuquerque, for plaintiff-appellee.

John W. Boyd, Freedman & Boyd, Albuquerque, for defendants-appellants.

OPINION

HERNANDEZ, Judge.

On December 14, 1971, plaintiff recovered a judgment against Copy Machines, Inc. (CMI), a New Mexico Corporation, no part of which was ever satisfied. Plaintiff subsequently filed this suit against the defendants, who were officers, directors and shareholders of CMI, seeking to hold them personally liable for this judgment. The trial court, sitting without a jury, entered judgment for plaintiff. The trial court made the following findings, among others:

"3. Said corporation [CMI] is the *alter ego* of the defendants . . . ; defendants manipulated the corporate entity to their own purpose, convenience and benefit, disregarded the same and their duties as stockholders, directors and offi-

cers . . ., and are chargeable with mismanagement and incurring the debt for which the aforesaid judgment was rendered at a time they knew or should have known the corporation was insolvent and financially unable to meet its just debts.

"4. Said corporation never paid franchise taxes to the State of New Mexico, and by reason of such failure, particularly failure to pay the required minimum franchise tax upon incorporation, never qualified to transact business as a corporation in New Mexico.

5. "Defendants, notwithstanding, thereafter assumed to act as a corporation . . . incurring the debt upon which the aforesaid judgment was rendered.

"6. Defendants utilized said corporation as a fraud upon creditors, specifically upon this plaintiff, and in an attempt to avoid personal liability for debt."

Defendants' appeal alleged two points of error. The first point, which is dispositive of this appeal, is that the trial court's findings of fact are not supported by substantial evidence.

▄ As a preliminary matter we think it important to analyze the trial court's findings of fact. Section 21–1–1(52)(B)(a)(2), N.M.S.A.1953 (Repl.Vol. 4) provides in part:

"The findings of fact shall consist only of such ultimate facts as are necessary to determine the issues in the case, as distinguished from evidentiary facts supporting them."

Our Supreme Court defined an "ultimate fact" as "the essential and determining facts upon which the court's conclusion rests and without which finding the judgment would lack support in an essential particular." *Brundage v. K. L. House Construction Company,* 74 N.M. 613, 616, 396 P.2d 731, 732 (1964). In other words, ultimate facts are factual conclusions deduced by a trial court from the evidentiary facts. Or stated conversely, ultimate facts should not be a mere enumeration or recapitulation of the evidentiary facts. Viewing the above findings in this light, the ultimate facts found were: (1) CMI is the *alter ego* of the defendants; (2) CMI never qualified to transact business as a corporation in New Mexico; (3) defendants utilized said corporation as a fraud upon creditors.

The evidence adduced at trial was sketchy and consisted mainly of the interrogatories and testimony of the defendants.

CMI was chartered as a corporation on June 9, 1969. The articles of incorporation provided that the corporation had the authority to issue the aggregate number of 250,000 shares, par value $1.00 per share. The initial three directors were listed as Evan Mahaney, Norma Jean Mahaney, and Paul P. Schwartz.

The bylaws provided the following: the annual meeting of shareholders shall be held on the 1st day of March of each year; the majority of the stock of the corporation must be represented in person or by proxy to constitute a quorum; the board of directors shall hold its meetings at such items and places as it may designate. Further, a majority of directors in office would be necessary to constitute a quorum for the transaction of business. The president of the corporation was charged with the general management of the business, including making contracts and agreements in the name of the corporation; the president was also charged with seeing that the books, reports, statements and certificates required by statute were properly kept, made and filed according to law.

The first meeting of the shareholders was held on March 1, 1970. The Model Business Corporation Act, which New Mexico adopted in 1967, [51–24–1 to 51–31–11], § 51–24–27, N.M.S.A.1953 (Repl.Vol. 8, pt. 1, Supp.1975) provides that an annual shareholder's meeting be held within a thirteen-month period. The minutes of this meeting show that capital stock of the corporation was issued as follows: J. T. Mahaney—1200 shares, George Hensley—950 shares, Evan Mahaney—850 shares. The

shareholders elected three directors: Evan Mahaney, George Hensley, Ann Hyder. [The Business Corporation Act provides that as few as one director may be elected, § 51–24–35, supra.] The president and secretary of the corporation were authorized to sign checks and drafts on behalf of the corporation.

The first meeting of the board of directors was held on that same date. The minutes show: Officers were elected (President—Evan Mahaney, Vice-President—George Hensley, Secretary-Treasurer—Ann Hyder); the president and secretary issued stock in the amounts subscribed upon payment of the purchase price (J. T. Mahaney, 1200 shares—$1200; Evan Mahaney, 850 shares—$850; George Hensley, 950 shares—$950). According to the minutes of this meeting, the total capitalization of the corporation was $3,000. This figure was in dispute in subsequent testimony, as was the fact of the issuance of stock. [The Business Corporation Act formerly provides that paid-in capital be as little as $1,000, but this section was deleted by amendment in 1975, § 51–25–2, supra. There is no required minimum amount at the present time in New Mexico.]

There are no other corporate records apart from notations that stock certificates Nos. 1–3 were issued in the amounts specified above, and notations in the stock transfer ledger to the effect that the original issue on June 13, 1969 was 510 shares to George Hensley and 490 shares to Evan Mahaney.

Defendants' answers to interrogatories and direct testimony conflicted with the documentary evidence on several points.

On direct examination by plaintiff's attorney, Mr. Mahaney testified that the figures showing capitalization at $3,000 were in error and the total capitalization was in fact $30,000 ($12,000, $9,500, and $8,500 for the three shareholders). George Hensley testified that his initial investment was $10,000. Mahaney in interrogatories stated that he financed the corporation with the help of a loan from the American Bank of Commerce for a total capitalization of $32,000 to $35,000. On the stand he altered that testimony somewhat to indicate that he, Hensley, and his uncle, J. T. Mahaney, had put up the money, in addition to the loan from the bank which he had personally guaranteed. Corporation check receipts entered into evidence were made out to American Bank of Commerce; Mahaney testified that these checks were in payment of the loan (in the amount of $20,000) and that he was presently paying it off in his personal capacity.

An additional discrepancy in testimony occurred with respect to the issuance of stock. In answers to interrogatories Mahaney stated that the corporation had not issued stock; in direct testimony, he said it had. The corporation records also evidence a stock issuance, as did Hensley's testimony.

Several corporation checks were issued in payment of Mahaney's personal obligations. Partular issue was made of the purchase of a used car which cost $1,116.41. Mahaney testified he used the car for business purposes, with the approval of Hensley; he ultimately sold the car and turned the proceeds over to the corporation. He justified his actions by stating he had taken these amounts in lieu of salary as an *employee* of the corporation with the full approval of another director, Hensley. The amounts, apart from the car mentioned above, were not significant. In answers to interrogatories, Mahaney denied ever receiving compensation from the corporation in his capacity as an *officer*, or a *director*.

Both Hensley and Mahaney testified that directors' meetings were not formal, but were often held over the telephone. This practice is authorized by § 51–24–41, supra. The necessary quorum would be present (§ 51–24–39, supra).

CMI was defunct by April-May of 1971. It never declared bankruptcy, nor did it have its charter revoked; it simply ceased to do business.

■ Looking first at the finding that CMI was the *alter ego* of defendants, we

start with the basic proposition that the corporate entity should be recognized and supported. As was stated by the Supreme Court of the United States in *Anderson v. Abbott,* 321 U.S. 349, 361, 64 S.Ct. 531, 537, 88 L.Ed. 793 (1944) :

> "Normally the corporation is an insulator from liability on claims of creditors. The fact that incorporation was desired in order to obtain limited liability does not defeat that purpose. [Citations Omitted] *Limited liability is the rule not the exception*; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted." [Emphasis Ours.]

However, the corporate entity will be disregarded by the courts when the corporation is used to perpetrate fraud or promote injustice. Our Supreme Court has stated these principles in this way :

> "The corporate form of business entity was recognized in our law even before the adoption of our Constitution. See Art. XI, §§ 12 and 13, New Mexico Constitution. Persons engaged in business adopt the corporate form of operation because of acknowledged, legitimate advantages that flow therefrom. One of these advantages lies in the recognition accorded to corporations as entities in and of themselves. True, under certain circumstances the courts have looked behind the corporate facade to the individual or individuals who own the corporation. However, as pointed out in *State Trust and Savings Bank v. Hermosa Land & Cattle Co.,* [30 N.M. 566, 240 P. 469], this is done where the corporation was set up for fraudulent purposes, or where to recognize the corporation would result in inequity." *Shillinglaw v. Owen Shillinglaw Fuel Co.,* 70 N.M. 65, 69, 370 P.2d 502, 505 (1962).

■ Generally the determination that "shareholders are the *alter egos* of the corporation" describes the specific situation where the shareholders have so manipulated the corporation to further their own individual interests that the identity of the corporation has merged into its shareholders. That is to say, that the two have, in fact, become so closely identified that a court in ruling that the corporate entity should be disregarded is merely recognizing reality. The Supreme Court of Nevada in *Carson Meadows Incorporated v. Pease,* 533 P.2d 458, 460 (Nev.1975) stated it this way :

> "The alter ego doctrine may be applied when the corporation is influenced and governed by the person or persons asserted to be its alter ego [where]; there is such unity of interest and ownership that one is inseparable from the other; and adherence to the fiction of separate entity would sanction a fraud or promote injustice."

In finding *alter ego*, the trial court stated that "defendants manipulated the corporate entity to their own purpose, convenience and benefit." The appellees contend as proof of this assertion that the corporation was operating at a loss in 1970 and 1971. There is nothing in the record to indicate why it was operating at a loss in these years. It could well have been due to poor management and nothing more.

Plaintiff states "there had never been a time when the assets equaled or exceeded its liabilities." Support for this assertion was found in defendant Mahaney's response to an interrogatory to that effect. Why Mahaney answered as he did, in light of the fact that Hensley contributed $23,000 toward the initial capitalization of CMI, was explained when Mahaney testified at trial: ". . . I will tell you very honestly that I sat down at my house bar and answered these things just right off the top of my head, because I couldn't believe that something this—well, I just couldn't believe it. I probably should have consulted him [his attorney]. I can see that."

Other matters cited by plaintiff were: that there were never directors' meetings for purposes other than to elect officers; Mahaney ran the whole operation; with-

out authority he wrote checks upon the corporate account at such times and for such purposes as motivated him.

Mahaney was the president of the corporation: the bylaws gave him the authority to manage the corporation and in this capacity he had authority to write checks on the corporate account. While it is true that the three directors and stockholders never held a formal meeting, other than the initial meeting to elect officers and adopt bylaws, they did consult frequently by telephone as to corporate affairs. There is nothing in the record to indicate that checks were drawn for the purpose of diverting corporate funds to the detriment of its creditors. Mahaney never was paid a regular salary and periodically he drew modest sums for his own use.

■ As to the defendant Hensley, plaintiff argues that he had no duties as officer or director, that he did know who the officers or directors were, and he had never read the bylaws, nor did he know if the corporation had issued stock or for what consideration. Granted the ignorance of an officer or director about corporate affairs will not absolve him from liability for intentional mismanagement of the corporation by others, but such ignorance without more does not warrant disregarding the corporate entity.

■ There was disregard of corporate formality in the operation of this corporation and there was considerable ignorance on the part of the directors and officers as to its operation. These things in and of themselves are not enough to warrant disregarding the corporate entity. However, should mismanagement occur for fraudulent purposes or result in injustice, then the corporate entity will be disregarded. We find no evidence of fraud or injustice here.

The trial court's finding that CMI never qualified to transact business as a corporation is in error. CMI was issued a certificate of incorporation by the State Corporation Commission of New Mexico on June 9, 1969. Our Business Corporation Act, provides in § 51-25-4, supra:

"Upon the issuance of the certificate of incorporation, *the corporate existence shall begin, and the certificate of incorporation shall be conclusive evidence that all conditions precedent required to be performed by the incorporators have been complied with* and that the corporation has been incorporated under the Business Corporation Act . . ., except as against this state in a proceeding to cancel or revoke the certificate of incorporation or for involuntary dissolution of the corporation." [Emphasis Ours.]

As was stated in *Skarda v. Commissioner of Internal Revenue*, 250 F.2d 429, 435 (10th Cir. 1957) concerning a section of our prior Business Corporation Act, which statement is equally applicable to our present act:

". . . [S]tatutory conditions to the right to engage in business, to be performed after the corporation has been formed, are conditions subsequent, and while a non-compliance therewith may give the state a right to proceed to forfeit the franchise, such non-compliance in the absence of such proceeding does not in anywise affect the legal existence of the corporation."

Finally, the finding that the defendants utilized CMI as a fraud upon creditors has no support whatever in the record.

"An actionable fraud is a misrepresentation of a fact, known to be untrue by the maker, and made with an intent to deceive and to induce the other party to act upon it with the other party relying upon it to his injury or detriment." *Unser v. Unser*, 86 N.M. 648, 653, 526 P.2d 790, 795 (1974).

The judgment is reversed.

IT IS SO ORDERED.

SUTIN and LOPEZ, JJ., concur.