2005-NMCA-131

124 P.3d 585

**ALTO ELDORADO PARTNERSHIP, Joseph Miller, Alma Miller, Chris Miller, Matt Miller, Rancho Verano, L.L.C., Summit Partnership 2, and Santa Fe Partners I, Plaintiffs–Appellees,**

v.

**AMREP Corporation, an Oklahoma corporation, Defendant–Appellant.**

**No. 23,515.**

Court of Appeals of New Mexico.

Sept. 28, 2005.

Law Offices of Brad L. Hays, L.L.C., Brad L. Hays, Rio Rancho, NM, Roth, VanAmberg, Rogers, Ortiz, Fairbank & Yepa, L.L.P., Ronald J. VanAmberg, Santa Fe, NM, for Appellees.

Lastrapes, Spangler & Pacheco, P.A., Matthew M. Spangler, Rio Rancho, NM, for Appellant.

## OPINION

KENNEDY, Judge.

{1} We certified this case to our Supreme Court under NMSA 1978, § 34–5–14(C) (1972), as we believed that our differing views of jurisdiction required resolution. Following oral argument above, our Supreme Court quashed certification as improvidently granted and returned the case to this Court.

*But see id.* ("Any certification by the court of appeals under this subsection is a final determination of appellate jurisdiction."). We now enter our respective opinions as they were set forth in the order of certification.

{2} Defendant Amrep Corporation (Amrep) brings this interlocutory appeal from the district court's denial of Amrep's motion to dismiss for lack of personal jurisdiction. We must decide whether the district court has personal jurisdiction over Amrep. This inquiry presents the primary issue of whether alter ego is a viable theory for obtaining personal jurisdiction over a foreign corporation in New Mexico, and if not, whether the district court could properly assert jurisdiction over Amrep. We hold that under these facts, an alter ego theory that uses substantive corporate law is not the test that New Mexico uses for personal jurisdiction. Instead, the test is one of constitutional perimeters. As Plaintiffs made a sufficient showing to satisfy the due process requirement of minimum contacts for jurisdiction over Amrep, we affirm.

**PROCEDURAL HISTORY**

{3} On September 18, 1997, Plaintiffs filed a complaint against Eldorado Utilities, Inc. (EUI) for breach of contract, negligent misrepresentation, innocent misrepresentation, negligence, injunctive relief, and violation of the Unfair Trade Practices Act. Plaintiffs later dismissed their Unfair Trade Practices Act claim against EUI.

{4} EUI is a New Mexico incorporated public utility that has the "right and obligation" to provide water to its franchise area. Plaintiffs were landowners and developers in the EUI franchise area in Santa Fe County. Plaintiffs claimed that EUI committed itself to serve as a water utility for their real estate developments in its franchise area. According to Plaintiffs, Santa Fe County later determined that EUI was unable to do so, and prohibited any further developers from relying on EUI for their water. Santa Fe County subsequently imposed a moratorium on subdivision within EUI's service area. Plaintiffs urged EUI to fight this decision; EUI would not. When Plaintiffs brought this matter before the Public Utility Commission (PUC), which is now the Public Regulation Commission, EUI refused to join in the proceedings, and was involuntarily joined by the PUC Hearing Officer. PUC staff recommended finding that EUI could not service Plaintiffs' proposed developments. Plaintiffs further alleged that Santa Fe County imposed another ordinance in 1997 due to EUI's inability to provide adequate water, which was extended in 1998 and 1999. In 1999, EUI informed its customers that it was at "Water Alert Stage 2," and unable to "produce water under existing conditions at a sufficient rate to meet [the] consumption" of its customers. Essentially, Plaintiffs' complaint alleged that EUI promised them something it could not provide: water. Now, Plaintiffs complain, they own land that they cannot develop as they had planned. Plaintiffs also asserted that EUI did not fight the ordinances because Amrep's land development subsidiaries, including Eldorado at Santa Fe and Amrep Southwest, compete with Plaintiffs. EUI's failure would help Amrep by hurting those competing with its land-development subsidiaries. As one of its own officers stated, Amrep is in the land business, not the utility business.

{5} EUI is a wholly owned subsidiary of Amrep. On March 29, 2000, Plaintiffs filed an amended complaint naming Amrep as a defendant. The amended complaint also named Amrep Southwest, another wholly owned Amrep subsidiary, and Eldorado at Santa Fe, a subsidiary of Amrep Southwest. Both are incorporated in New Mexico. A diagram of Amrep's corporate structure would look like:

{6} Amrep, an Oklahoma corporation, was served with the amended complaint in Oklahoma, and does not contest this service. However, on May 11, 2000, Amrep's counsel, who also serves as EUI's counsel, entered a special appearance to challenge the district court's jurisdiction. Amrep then filed a motion to dismiss for lack of personal jurisdiction. The district court ordered discovery on the jurisdictional issue, and on June 13, 2002, Plaintiffs filed their response to Amrep's motion. On August 30, 2002, Amrep filed its reply with an affidavit from Gary Sullivan, EUI's treasurer. Amrep's motion to dismiss was denied by the district court on September 23, 2002, and Amrep appealed. For the reasons set forth below, we affirm.

## FACTS

{7} Most of the facts in this case are undisputed. Amrep is a holding company publicly traded on the New York Stock Exchange. Amrep essentially has two ventures: cable television and real estate. The real estate branch of Amrep owns the New Mexico Amrep subsidiaries listed above. In 1973, EUI, not its parent Amrep, applied to run a water utility in New Mexico. Minutes from a special meeting of EUI's board in 1973 stated that EUI "was formed for the purpose of providing water utility service at El Dorado at Santa Fe." EUI was created to facilitate the real estate interests or ventures of Amrep. According to EUI's president, who also serves as vice president for Amrep, when Amrep's land subsidiaries no longer need EUI, Amrep will sell it. Specifically, Amrep is in the land business, not the utility business.

{8} PUC required that Amrep subsidize any of EUI's operating shortfalls. The 1973 PUC order noted that "[a]s the revenues from the utility operation will be insufficient to maintain the utility in a 'no-loss' position for several years, the payments made by AMREP are the additional revenues needed to maintain the utility in a 'no-loss' financial position." PUC ordered that "AMREP ... shall annually pay ... the amount required to maintain [EUI] in a 'no-loss' financial position until such a time as [EUI] becomes a self sustaining utility." The final order approving this subsidization agreement found

jurisdiction over the parties, but does not state who those parties were. In 1993, EUI asked PUC to end this requirement, since the subsidization requirement interfered with Amrep's desire to sell EUI. The subsidization requirement ended in 1994. In its 1994 order, PUC stated that it had jurisdiction over EUI and "all the parties to [the] case," and that EUI had become self-sustaining. However, from 1994 until 1999, Amrep gave EUI millions of dollars in what it called. "capital contributions." EUI's employee supervisor, James William McLean, stated that EUI never had any money. If EUI needed money, such as to drill a well, it looked to Amrep to pay for it.

{9} By 2001, EUI had an income of $1,300,000. In 2002, its assets alone were worth $8,500,000. EUI had 2700 customers, some employees, and contracts in its own name. Amrep referred to EUI as a subsidiary, and not as a department or division. EUI filed its own separate financial statement with PUC as part of that Commission's requirements.

{10} Amrep officers were also officers for its New Mexico subsidiaries. James Wall served as the senior vice president for Amrep and the president of Amrep's New Mexican subsidiaries, including EUI. He considered himself an employee of Amrep and of Amrep Southwest; he was the primary link between the two. He was also the common link between Amrep Southwest and EUI. Below, counsel argued over whether EUI's board ever elected Wall as their chief executive officer. Defense counsel, however, only pointed to EUI board minutes appointing Wall as president of EUI. When asked about his relationship with EUI, Wall stated that he served as the "CEO for all the real estate for AMREP," and that the only position he held with Amrep itself was as its senior vice president. However, he did not have a contract with EUI nor a job description with this subsidiary. Wall's salary and raises were set by Amrep, but Amrep Southwest actually paid him. Wall reported directly to an executive committee that served as the CEO of Amrep, and considered it his "boss." Amrep and its various subsidiaries, including EUI, had a common payroll system, and

consolidated their annual reports and financial statements.

{11} When Wall reported the Santa Fe County moratorium to Amrep, he was directed to "[f]ix it." When asked why EUI did not fight this moratorium, Wall said that "[w]e have a lot of other things that came before the county [and][w]e didn't feel it was in our best interest at that time to challenge [the county] legally." These issues included a road system for its subdivision and zoning. Being in the land business, and not the utility business, Amrep apparently chose to make the interests of its land development subsidiaries superior to the issues facing EUI.

{12} EUI's officers also included Gary Sullivan, Mohan Vachani as vice president, and Wendy Mitchell as secretary. Vachani was the Corporate Finance Officer for Amrep, plus an officer and director of its subsidiaries, serving as vice president for Eldorado at Santa Fe. Sullivan was the comptroller of Amrep Southwest and a director at Eldorado at Santa Fe. Mitchell served as vice president of human resources for Amrep Southwest, and secretary for Eldorado at Santa Fe.

{13} Amrep asserts that EUI, and not Amrep, ran the day-to-day operations of EUI. Wall stated that McLean ran EUI's day-to-day operations. McLean supervised at least some of EUI's employees. McLean, however, stated that he did not work for EUI or have a contract with that subsidiary. Rather, McLean's contract was with Amrep Southwest.

{14} EUI's board of directors existed because Wall needed a "legal board" to conduct business. EUI shared officers with Amrep from its incorporation in 1973. EUI board meetings were held in Amrep's corporate offices in New York for approximately ten years. The Santa Fe County moratorium and the litigation that resulted in the appeal before us never went before the board of EUI. The board minutes reflect elections, such as electing Wall president (but not CEO) of EUI, adoption of a retirement plan, and a special meeting regarding a loan agreement. The sale of EUI's assets appeared not in the minutes of EUI, but in the minutes of Amrep, where it was ultimately approved in 1990. The record is unclear as to what happened to this deal, and there are not any minutes from EUI pertaining to it.

## DISCUSSION

### Standard of Review for Personal Jurisdiction

{15} "The issue of whether the district court has personal jurisdiction over [a] non-resident [defendant] . . . is a question of law, which we review de novo." *Santa Fe Techs., Inc. v. Argus Networks, Inc.*, 2002–NMCA–030, ¶ 12, 131 N.M. 772, 42 P.3d 1221. Here, the district court ruled on the jurisdictional issue after a hearing. The district court heard the arguments of counsel for both Plaintiffs and Amrep, but the hearing was not evidentiary in nature. "Therefore, the party asserting jurisdiction need only make a prima facie showing that personal jurisdiction exists." *Id.* (internal quotation marks and citation omitted). Furthermore, since the district court based its ruling on "pleadings and affidavits, the standard of review resembles that of summary judgment; the appellate court reviews the pleadings and affidavits or sworn testimony in the light most favorable to the party asserting jurisdiction." *Id.* Since Plaintiffs have asserted jurisdiction, and the district court did not hold an evidentiary hearing on the jurisdictional issue, this Court's de novo review favors Plaintiffs.

### Whether New Mexico Requires Use of an Alter Ego (or Agency) Theory

{16} Plaintiffs contend that EUI is the alter ego of Amrep, and that this relationship gives New Mexico courts personal jurisdiction over Amrep. Both agency and alter ego have been referred to in dicta as jurisdictional theories in New Mexico. *Smith v. Halliburton Co.*, 118 N.M. 179, 186, 879 P.2d 1198, 1205 (Ct.App.1994). Amrep's brief in chief merely inserts a block quote on the issue of agency, and Plaintiffs' answer brief does not appear to address the agency issue at all. Just as we will not review arguments that do not cite any legal authority, we may not construe quotes without reference to facts or argument as sufficient to permit our review of an issue. *ITT Educ.*

*Servs. Inc. v. Taxation & Revenue Dep't,* 1998–NMCA–078, ¶ 10, 125 N.M. 244, 959 P.2d 969 (requiring legal citations for proper review of legal arguments). Thus, we will not directly address the issue of agency.

**▉** {17} Indirectly, however, agency principles may be useful to the question of jurisdiction over Amrep. Agency and alter ego might require a separate analysis when used to assert liability over a foreign corporation, but "it is difficult to see a significant distinction between the two theories for jurisdictional purposes." *SGI Air Holdings II LLC v. Novartis Int'l AG,* 239 F.Supp.2d 1161, 1166 (D.Colo.2003). Both theories "often depend on the same type of evidence." *Id.* As we will explain, the true inquiry must be focused on minimum contacts and not substantive principles of corporate law; we address the theory of alter ego with the understanding that agency cases may be useful in our analysis. To do this, we must first decide whether alter ego is even a viable theory to establish personal jurisdiction in New Mexico, and if so, to what extent. This fundamental question went unaddressed by the parties, who focused only on the application of an alter ego theory to the facts.

{18} Alter ego, however, is primarily used to establish liability. *See, e.g.,* Antoinette Sedillo López, *Comment, The Alter Ego Doctrine: Alternative Challenges to the Corporate Form,* 30 UCLA L.Rev. 129 (1982). When we are called upon to review an "alternative challenge[ ]" to the corporate form, "[t]he traditional alter ego analysis is often inadequate when applied ... and, as a result, rulings are often inconsistent." *Id.* at 131. Assertions of jurisdiction based on an alter ego theory are one such category of "unusual challenges." *Id.* at n. 12.

**▉** {19} The usual challenge using the alter ego theory seeks to pierce the corporate veil, to disregard the separate nature of a corporation and its subsidiary for purposes of liability. *Id.* at 129–30; *see, e.g., Scott v. AZL Res., Inc.,* 107 N.M. 118, 121, 753 P.2d 897, 900 (1988) (stating that piercing the corporate veil requires findings not only of instrumentality, but of improper purpose and proximate cause). We have applied the alter ego exception to a question of the liability of

a parent corporation for the acts of its subsidiaries in cases like *Cruttenden v. Mantura,* 97 N.M. 432, 434–35, 640 P.2d 932, 934–35 (1982). Liability based on an alter ego theory lies "where the shareholders have so manipulated the corporation to further their own individual interests that the identity of the corporation has merged into its shareholders." *Scott Graphics, Inc. v. Mahaney,* 89 N.M. 208, 211, 549 P.2d 623, 626 (Ct.App. 1976). Liability through an alter ego theory thus focuses on the identity of each entity and the use of substantive principles of corporate law. For example, *Cruttenden* says that referring to the subsidiary "as such or as a department or division" is one factor in assessing whether one corporation is the alter ego of another. *Cruttenden,* 97 N.M. at 435, 640 P.2d at 935 (internal quotation marks and citation omitted). Yet the long-arm statute focuses on minimum contacts. NMSA 1978, § 38–1–16(A) (1971). We hold that liability and jurisdiction are different inquiries that focus on different principles and frequently on different bodies of law.

{20} These differing inquiries have led courts to apply alter ego theories to questions of jurisdiction in two distinctly separate ways. López, *supra,* at 131 n. 12. One approach imports the state's own unique alter ego test into the state long-arm statute. *See, e.g., Jemez Agency, Inc. v. CIGNA Corp.,* 866 F.Supp. 1340, 1343–44 (D.N.M. 1994) (requiring the plaintiffs to satisfy all three prongs of the alter ego test for liability as set forth in *Scott,* 107 N.M. at 121, 753 P.2d at 900). The result of satisfying the alter ego test when applied to jurisdiction would be to "attribut[e] [the] contacts of one person or entity to another." *Purple Onion Foods, Inc. v. Blue Moose of Boulder, Inc.,* 45 F.Supp.2d 1255, 1258 (D.N.M.1999). If we took this approach here, for example, and held that EUI was the alter ego of Amrep, then EUI's contacts with New Mexico would be attributed to Amrep. *See id.; see also N. Laminate Sales, Inc. v. Matthews,* 249 F.Supp.2d 130, 137 (D.N.H.2003) (applying a traditional alter-ego test to the question, and discussing the use of an alter-ego theory to pierce the corporate veil to establish jurisdiction so that corporate contacts may be attrib-

uted to another); *Snell v. Bob Fisher Enters., Inc.,* 106 F.Supp.2d 87, 90 (D.Me.2000) (same). Put another way, our general jurisdiction over EUI would give our courts general jurisdiction over Amrep.

{21} This approach has found favor with many state and federal courts. Lonny Sheinkopf Hoffman, *The Case Against Vicarious Jurisdiction,* 152 U. Pa. L.Rev. 1023, 1029 (2004). Even some law reviews favored this approach. *Id.* at 1031; *see, e.g.,* Lea Brilmayer & Kathleen Paisley, *Personal Jurisdiction and Substantive Legal Relations: Corporations, Conspiracies, and Agency,* 74 Cal. L.Rev. 1 (1986). As *Purple Onion Foods* commented on this trend, "the theory has a certain common-sense appeal." *Purple Onion Foods,* 45 F.Supp.2d at 1258. Indeed, if one could prove that one entity was the alter ego of another, showing that they were essentially the same entity, then it would appear to make sense to treat them as one for all purposes, including liability and jurisdiction. This approach would allow a court to satisfy the constitutional requirements by sole use of a straightforward alter ego test instead of focusing on a broader, amorphous, constitutional test.

{22} The second approach to questions of jurisdiction that seek to employ alter ego theories rejects such a use of substantive corporate law. *Id.* at 1259. Cases like *Purple Onion Foods* would require that the corporation "have sufficient contacts of its own with New Mexico in order to be subject to suit." *Id. Energy Reserves Group, Inc. v. Superior Oil Co.,* 460 F.Supp. 483, 490 (D.Kan.1978), also rejected a strict application of substantive corporate law when faced with a question of jurisdiction over a foreign corporation. *Energy Reserves* examined in great detail how the Supreme Court decision in *Cannon Manufacturing Co. v. Cudahy Packing Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), precipitated the use of substantive corporate law when evaluating jurisdiction over an entity not incorporated within a forum's borders. *Energy Reserves,* 460 F.Supp. at 495–99; *see* Hoffman, *supra,* at 1029. Amrep relies in part on *Cannon Manufacturing* for the proposition that New Mexico incorporation of a subsidiary does not subject its non-resident parent to New Mexico jurisdiction. *Cannon Manufacturing,* however,

> was decided in a context where extraterritorial service of process on a non-resident corporation was statutorily unauthorized and constitutionally restricted by the old notions of territorial power limitations on a state's ability to issue service beyond its borders. *Cannon* therefore imposed merely a statutory obstacle to service on a non-resident corporation on the basis of its subsidiary's business in the forum. That statutory obstacle, however, was reflective of the constitutional obstacle to extraterritorial service then extant under the territorial due process constraint that a state might exercise jurisdiction only over those persons present in the forum. . . .
>
> Although often cited for the proposition that the mere presence of a subsidiary corporation within a state does not provide a basis for personal jurisdiction over a non-resident parent corporation, *Cannon* specifically held that the business of a subsidiary in the state did not constitute sufficient "doing business" in that state by the parent to warrant an inference of the parent's "presence" there. Thus, local service of process on the domestic subsidiary was held insufficient as a means to invoke jurisdiction over the non-resident parent.

*Energy Reserves,* 460 F.Supp. at 495–96. Thus, under *Cannon,* the foreign corporation needed to be "present" in the state, which required showing that the corporation was "doing business" in the forum. *Energy Reserves,* 460 F.Supp. at 497 (internal quotation marks and citation omitted); *see Cannon,* 267 U.S. at 334–35, 45 S.Ct. 250; *see also* Hoffman, *supra,* at 1042, 1044. Since the corporation had to be "present," and a state long-arm statute was not available, that court had to establish jurisdiction over a foreign corporation by use of an alter ego theory. *Energy Reserves,* 460 F.Supp. at 497.

{23} This Court is not bound by such restraints. First, unlike *Cannon,* New Mexico has a long-arm statute authorizing service on foreign corporations. Section 38–1–16(A)(1); *see Cannon,* 267 U.S. at 336, 45 S.Ct. 250 ("The claim that jurisdiction exists

[did] not rest[ ] upon the provisions of any state statute."). Second, New Mexico's long-arm statute has language reflecting *Cannon's* "doing business" requirement. Section 38–1–16(A) (stating that the court has jurisdiction when a cause of action arises from "the transaction of any business within this state"); *Cannon*, 267 U.S. at 334–35, 45 S.Ct. 250 ("The main question for decision is whether, at the time of the service of process, defendant was doing business within the [s]tate in such a manner and to such an extent as to warrant the inference that it was present there."). Third, fulfillment of the technical requirements for service under the long-arm statute has been equated with minimum contacts. *Santa Fe Techs.*, 2002–NMCA–030, ¶ 13. The equation of technically "doing business" with a minimum contacts analysis reflects an ideological shift from *Cannon's* "presence" requirement to the "minimum contacts" requirement of *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

{24} *International Shoe Co.* requires a defendant to have "minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* at 316–17, 66 S.Ct. 154 (internal quotation marks and citation omitted). Minimum contacts are as important as "[t]he requirement of overall fairness." *Energy Reserves*, 460 F.Supp. at 501–02. The Court in *Shaffer v. Heitner*, 433 U.S. 186, 212–13, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), reiterated that *International Shoe Co.* was the constitutional standard for personal jurisdiction.

{25} However, the parties essentially argue that Plaintiffs must either show the minimum contacts of the parent corporation *or* that EUI is the alter ego of Amrep. Even if we held that EUI was the alter ego of Amrep, we would not be relieved of a due process inquiry. Due process requirements must be satisfied no matter what theory a plaintiff uses. An alter ego theory under substantive corporate law principles is not a substitute for minimum contacts. Furthermore, "[t]o read *Cannon* or the alter ego doctrine as a limitation upon *International Shoe Co.* is to elevate to a constitutional level a statutory obstacle to extraterritorial service of process that was generated in the context of a now obsolete jurisdictional analysis." *Energy Reserves*, 460 F.Supp. at 504. *Energy Reserves* further rejected any "constitutional immunity" from suit that would be the natural result of requiring the satisfaction of an alter ego test above and beyond minimum contacts to obtain jurisdiction over a foreign parent. *Id.* at 506–07. Since New Mexico law allows jurisdiction to the full limits of constitutionality under *Federal Deposit Insurance Corp. v. Hiatt*, 117 N.M. 461, 463, 872 P.2d 879, 881 (1994), we decline to impose such an unnecessary limitation. Therefore, we do not require that all of the elements of alter ego be proven in order to hale a foreign corporate parent into court, but we can and will consider whatever elements a plaintiff shows in assessing minimum contacts. "Put simply, separation of formal corporate identities does not impose a constitutional barrier to the exercise of jurisdiction over a non-resident corporation." *Energy Reserves*, 460 F.Supp. at 508. Rather, we require only what is necessary to establish jurisdiction in any and all cases: the satisfaction of due process.

{26} This conclusion does not render the parties' arguments entirely inapplicable. The substantive requirements of alter ego might be aptly applied to situations not presently before this Court. While we might decline to directly superimpose ill-fitting and questionably relevant principles of substantive corporate liability law onto our constitutional jurisdictional inquiry, the relationship between a parent and its subsidiary may be crucial in evaluating jurisdiction itself. "The mere existence of the relationship is one relevant factor." *Id.* at 507. The corporate relationship might also be probative of whether it is fundamentally fair to require the defendant to defend a suit in the forum. *Id.* at 508. Additionally, the showing of formation for an improper purpose under *Scott*, 107 N.M. at 121, 753 P.2d at 900, while not constitutionally mandated, might also be probative. Generally, our inquiry will turn on the facts of each case, as we review jurisdiction under the long-arm statute on a case-by-case basis. *Cronin v. Sierra Med.*

*Ctr.*, 2000–NMCA–082, ¶ 13, 129 N.M. 521,10 P.3d 845.

{27} Our holding that a plaintiff need not establish all elements of alter ego to make a prima facie case for jurisdiction is distinguishable from several other cases cited by the parties. First, *Smith* only referenced alter ego and agency in dicta. *Smith,* 118 N.M. at 186, 879 P.2d at 1205. *Smith* specifically found both inapplicable since the plaintiffs "failed to produce evidence sufficient to rebut [the defendant's] prima facie showing of separateness." *Id.* Plaintiffs here, however, did produce sufficient evidence. Amrep also places particular emphasis on *Jemez Agency,* 866 F.Supp. 1340, which itself relied on *Quarles v. Fuqua Industries, Inc.,* 504 F.2d 1358 (10th Cir.1974). *Quarles,* however, arose four years before *Energy Reserves,* did not explain why it applied corporate law to a question of jurisdiction under a long-arm statute, and applied a "transact business" requirement reminiscent of *Cannon. Quarles,* 504 F.2d at 1361. As we explained above, our long-arm statute's "doing business" requirement, which mirrored *Cannon,* has been equated with minimum contacts. *Santa Fe Techs.,* 2002–NMCA–030, ¶ 13; *see* § 38–1–16(A). *Jemez Agency* even noted that "[w]hether jurisdiction exists over a nonresident parent corporation by reason of the acts of a subsidiary is a matter governed by state law." 866 F.Supp. at 1343 (internal quotation marks and citation omitted). Federal cases may therefore be instructive, but are not controlling in this matter. *See Doe v. Roman Catholic Diocese of Boise, Inc.,* 121 N.M. 738, 741, 918 P.2d 17, 20 (Ct.App.1996) (finding federal authority interpreting Fed. R.Civ.P. 12 instructive). Defendant's other citations to federal cases are equally unpersuasive. Even less compelling, *Jemez Agency* misconstrued *Cruttenden* by citing it as a broad jurisdictional holding. *Jemez Agency,* 866 F.Supp. at 1343. *Cruttenden* specifically held that service on a parent corporation is not enough, without sufficient evidence that the parent is the alter ego of the subsidiary, to subject the subsidiary to the court's jurisdiction. *Cruttenden,* 97 N.M. at 434–36, 640 P.2d at 934–36. Unlike *Jemez Agency* and the case at bar, *Cruttenden* did not seek to apply the state's long-arm statute. *Crutten-*

*den,* 97 N.M. at 434–36, 640 P.2d at 934–36. The plaintiff in *Cruttenden* had merely served the parent in New Mexico and said that because the subsidiary was that parent's alter ego, service on the parent gave the court jurisdiction over the foreign subsidiary. *Id.* Amrep was properly and personally served under the New Mexico long-arm statute, and so we face an issue entirely different than that before the *Cruttenden* Court.

{28} The underlying issue before this Court is a matter of due process. In determining whether our courts have jurisdiction over an out-of-state defendant, we search for "the outer limits of what due process permits," because New Mexico's long-arm statute will extend as far as our Constitution allows. *Hiatt,* 117 N.M. at 463, 872 P.2d at 881 (internal quotation marks and citation omitted). We follow this principle in holding that due process guided by elements of an alter ego analysis frame our inquiry into the district court's personal jurisdiction over Amrep. The question then is not whether corporate law restricts our jurisdiction in contravention of the above principle, but whether due process allows for it.

**Whether Amrep Has Minimum Contacts with New Mexico**

{29} The parties disagree over whether Amrep has certain "direct contacts" with New Mexico. We have interpreted this reference to "direct contacts" as the way that the parties distinguished this portion of their argument from the portions that argued "alter ego contacts." The question, however, is not one of "direct contacts," but of minimum contacts which, by their nature, may give rise to either general or specific jurisdiction. The parties' arguments fail to explicitly distinguish between general and specific jurisdiction. Since both parties frame their arguments using the language and case law for specific jurisdiction, we will address the issue of personal jurisdiction over Amrep within that framework.

{30} Generally, personal jurisdiction over non-residents requires satisfaction of a three-part test: "(1) the defendant's act must be one of the five enumerated in the long-

arm statute; (2) the plaintiffs cause of action must arise from the act; and (3) minimum contacts sufficient to satisfy due process must be established by the defendant's act." *Santa Fe Techs.*, 2002–NMCA–030, ¶ 13 (internal quotation marks and citation omitted); *see also* § 38–1–l6(A) (providing in relevant part that jurisdiction can be obtained over an out-of-state defendant through the defendant's transaction of any business within this state or the defendant's commission of a tortious act within this state). Additionally, "[t]he first and third step of this test have been repeatedly equated with the due process standard of minimum contacts," removing the necessity of a technical determination of whether the non-resident committed an act enumerated by the long-arm statute. *Santa Fe Techs.*, 2002–NMCA–030, ¶ 13 (internal quotation marks and citation omitted). Hence, we do not address Amrep's arguments that its activities do not technically fall within the purview of the first prong of the long-arm statute, and instead focus this inquiry on Amrep's minimum contacts with New Mexico.

{31} Due process requires that an out-of-state defendant have "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co.*, 326 U.S. at 316, 66 S.Ct. 154 (internal quotation marks and citation omitted). Generally, the non-resident's activities in the forum state should be "such that he [or she] should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The key is whether "there [is] some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hiatt*, 117 N.M. at 464, 872 P.2d at 882 (internal quotation marks and citation omitted). With these principles in mind, we turn to the facts of this case.

{32} EUI, Amrep Southwest, and Eldorado at Santa Fe are New Mexico corporations. Yet Amrep's establishment of subsidiaries in New Mexico clearly does not, in and of itself, subject Amrep to our jurisdiction. "As a general rule, the mere relationship of parent corporation and subsidiary corporation is not in itself a sufficient basis for subjecting both to the jurisdiction of the forum state, where one is a nonresident and is not otherwise present or doing business in the forum state." *Smith*, 118 N.M. at 182, 879 P.2d at 1201 (internal quotation marks and citation omitted). When speaking of jurisdiction, this rule is only common sense, since personal jurisdiction is precisely that: personal.

{33} Amrep's New Mexico subsidiaries are also wholly owned. Even this fact, alone, is insufficient for personal jurisdiction over Amrep, as we will not subject passive investors to our jurisdiction solely on the basis of their investment. *See, e.g., Hiatt*, 117 N.M. at 465, 872 P.2d at 883. However, Plaintiffs made a prima facie case that Amrep did not simply own EUI; it completely controlled it to the point where EUI existed as little more than an instrument to serve Amrep's real estate interests.

{34} For jurisdictional purposes, Plaintiffs made a prima facie showing that Amrep controlled EUI through Wall, directing EUI's response to issues like the Santa Fe County moratorium. EUI's concerns, however, were ignored in favor of focusing on the land development concerns of Amrep Southwest and Eldorado at Santa Fe. *Cruttenden*, 97 N.M. at 435, 640 P.2d at 935 (stating that a factor in determining alter ego is whether "[t]he directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation" (internal quotation marks and citation omitted)). Even EUI's day-to-day operations were run by an employee of Amrep Southwest, who looked to Wall for direction, who in turn looked to Amrep. EUI's board members also worked for Amrep, Amrep Southwest, and Eldorado at Santa Fe, all of which subsidiaries had Wall as their CEO. *See id.* at 434–35, 640 P.2d at 934–35 (stating that having directors or officers in common is one factor in determining if a corporation is the alter ego of another). Apparently, EUI's board of directors did not direct any action pertaining

to the litigation before us, but Amrep did. Moreover, when it wished to divest itself of EUI, Amrep had EUI seek an end to PUC's requirement that it subsidize EUI's short-falls. Yet Amrep still had to give this de-pendant subsidiary millions of dollars in sub-sequent years. *See id.* (stating that other factors in determining alter ego are whether "[t]he parent corporation pays the salaries or expenses ·or losses of the subsidiary" and whether "[t]he parent corporation finances the subsidiary" (internal quotation marks and citation omitted)). Again, EUI's board of directors did not take up this matter, but someone did. Considering that Amrep' s interests spurred EUI to seek an end to the subsidization requirement, and EUI's "legal board" did not address it, it may be inferred that it was Amrep who made this decision on behalf of EUI. Lastly, the facts surrounding the beginning and end of the PUC order that required Amrep to subsidize EUI's operating shortfalls represents a particularly telling in-stance of Amrep acting in New Mexico.

{35} The above facts are sufficient mini-mum contacts to invoke the district court's jurisdiction. Furthermore, considering the extent of Amrep' s involvement with EUI's affairs, we cannot say that it would be funda-mentally unfair to require Amrep's involve-ment in litigation arising from those affairs. Even though the 1973 PUC order does not name the parties, it orders that "Amrep ... shall annually pay." Nothing in the record indicates that Amrep ever challenged PUC's ability to make such an order, or its jurisdic-tion to do so. We cannot fathom how Amrep could apparently subject itself to the jurisdic-tion of PUC, and not "[r]easonably anticipate being haled into court" here. *World Wide Volkswagen v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). By submitting to the PUC order to obtain per-mission to run EUI as a public utility, Amrep "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protec-tions of its laws." *Hiatt,* 117 N.M. at 464, 872 P.2d at 882 (internal quotation marks and citation omitted). Furthermore, in hav-ing EUI act, and sometimes not act, solely in the interests of Amrep, Amrep Southwest, and Eldorado at Santa Fe, Amrep's actions were "purposefully directed toward [New Mexico] residents." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (internal quotation marks and citation omitted). Therefore, Am-rep's minimum contacts with New Mexico are sufficient to satisfy due process concerns.

**Did Plaintiffs' Cause of Action Arise from These Minimum Contacts?**

■ {36} Having held that Amrep had minimum contacts with New Mexico, we must address the final prong of the long-arm statute. Section 38–1–16(A) requires that Plaintiffs' cause of action arise from Amrep's minimum contacts. Plaintiffs' claim must lie "in the wake" of such activities. *State Farm Mut. Ins. Co. v. Conyers,* 109 N.M. 243, 245, 784 P.2d 986, 988 (1989) (internal quotation marks and citation omitted). Here, Plaintiffs essentially claimed that Amrep operated and controlled EUI, and that EUI acted to their detriment. Plaintiffs have made a sufficient prima facie showing that their cause of action arose from Amrep's control, and its effects in New Mexico solely for the purposes of juris-diction.

**CONCLUSION**

{37} Plaintiffs have satisfied New Mexico's long-arm statute, including causation and minimum contacts. Section 38–1–16(A). They have made a prima facie showing that: (1) Amrep had minimum contacts with New Mexico sufficient to satisfy due process con-cerns, and (2) their cause of action arose from these contacts. We have held that New Mexico's test for alter ego is a matter of substantive corporate law, and that, under the facts presented by this case, it is not a test that Plaintiffs must satisfy in order to establish personal jurisdiction. Instead, we have reiterated that the true test for any assertion of personal jurisdiction is minimum contacts, and that our case law does not set a higher standard when the out-of-state defen-dant is a corporation. For these reasons, the district court having found that New Mexico had personal jurisdiction over Amrep, we affirm.

{38} **IT IS SO ORDERED.**

JONATHAN B. SUTIN, Judge (specially concurs).

LYNN PICKARD, Judge (dissents).

SUTIN, Judge (specially concurring).

{39} I agree with the district court's denial of Amrep Corporation's (Amrep's) motion to dismiss for lack of personal jurisdiction. However, the legal analysis can be less complex.

{40} Amrep did not itself transact the business of which Plaintiffs complain. Whatever contacts Amrep itself had with New Mexico were not in and of themselves sufficient for jurisdiction over Amrep. For jurisdiction over Amrep, Plaintiffs can turn only to legal theories through which Eldorado Utilities, Inc.'s (EUI's) transactions and contacts are attributable or imputable to Amrep. Those theories, usually, are alter ego, agency, and conspiracy. *See, e.g.,* NMSA 1978, § 38–1–16(A) (1971) ("Any person . . . who in person or through an agent does any of the acts enumerated . . . submits himself . . . to the jurisdiction of the courts of this state[.]"); *Jemez Agency, Inc. v. CIGNA Corp.,* 866 F.Supp. 1340, 1343 (D.N.M.1994) (stating that a court can invoke jurisdiction over a foreign parent predicated on the acts of its subsidiary under alter ego and agency theories); *Santa Fe Techs., Inc. v. Argus Networks, Inc.,* 2002–NMCA–030, ¶¶ 26–47, 131 N.M. 772, 42 P.3d 1221 (stating that a court can invoke jurisdiction over a foreign parent predicated on the acts of its subsidiary under agency and conspiracy theories).

{41} Plaintiffs were required to make a prima facie showing in the present case of alter ego or agency. *See Sanchez v. Church of Scientology,* 115 N.M. 660, 663, 857 P.2d 771, 774 (1993) (determining that the plaintiff failed to make a prima facie showing of conspiracy for jurisdiction); *Santa Fe Techs.,* 2002–NMCA–030, ¶¶ 12, 26 (stating that the plaintiff bore the burden of proof to make a prima facie showing of personal jurisdiction, including its establishment based on an agency theory). On appeal, Plaintiffs do not argue agency; they argue only alter ego. Thus, only alter ego is at issue in this appeal.

{42} When the issue of jurisdiction is submitted to the district court on affidavits and the plaintiff makes a prima facie showing of all of the elements of the substantive alter ego theory of liability of a parent for the transactions of its subsidiary, little question exists that the district court would appropriately deny a pretrial motion to dismiss. In the present case, Plaintiffs did not make a prima facie showing of the second and third elements of the substantive theory of liability, namely, the elements of improper or fraudulent purpose for incorporation and proximate causation. *See Jemez Agency,* 866 F.Supp. at 1343–44 (setting out the three requirements in order to pierce the corporate veil in New Mexico as "(1) a showing of instrumentality or domination; (2) a demonstration of improper or fraudulent purpose for incorporation; and (3) proximate causation"). The question is whether a prima facie showing of the first element of the substantive theory, that of instrumentality or domination, is sufficient for jurisdiction.

{43} In a plaintiff's quest to establish alter ego liability, in proving instrumentality or domination, the plaintiff must show that "the subsidiaries are mere business conduit[s] for the parent or [that] there is such unity of interest and ownership that the individuality or separateness of the two corporations has ceased." *Id.* at 1344 (internal quotation marks and citation omitted) (alterations in original). This is the "alter ego" aspect of the alter ego theory. *See id.* ("In other words, [in establishing the first requirement of instrumentality or domination,] the subsidiaries must be shown to be mere 'alter egos' of [the parent].").

{44} *Jemez Agency* speaks of the application of "principles" of alter ego "as a component of [the] due process analysis" for jurisdiction. *Id.* at 1346. The Court in *Jemez Agency* states: "The Court does not suggest . . . that any one state's principles of traditional alter ego analysis are mandated by due process." *Id.* at 1348. The Court further states: "Nor should this opinion be construed as holding that alter ego principles constitute the totality of the due process analysis. Other facts, aside from ownership of a subsidiary corporation, may indicate that the parent corporation has minimum contacts with the forum state." *Id.* These analyses in

*Jemez Agency* are applicable in the present case.

{45} A prima facie showing of instrumentality or domination should be sufficient to establish the minimum contacts necessary for jurisdiction without also having to prove the improper or fraudulent purpose and proximate causation elements required to establish liability. A plaintiff can also show other activity of a parent in the forum state to bolster an attempt to establish minimum contacts.

{46} Placing the facts in the record in this case against the guidelines in *Cruttenden v. Mantura,* 97 N.M. 432, 434–35, 640 P.2d 932, 934–35 (1982), and a minimum contacts analysis, I support the denial of Amrep's motion to dismiss at this early stage of the case based on the instrumentality/domination element of the substantive alter ego theory, together with Amrep's overall involvement in relation to New Mexico.

{47} Plaintiffs' showing is thin, to be sure, and affirming the district court's denial of Amrep's motion to dismiss is by little more than a hair's breadth, but it is in line with our standard that we review what is before us in a light most favorable to the party asserting jurisdiction. *See Santa Fe Techs.,* 2002–NMCA–030, ¶ 12 ("When the district court bases its ruling on the pleadings and affidavits ... the appellate court reviews [the record] in the light most favorable to the party asserting jurisdiction.").

{48} Because there was no evidentiary hearing on the issue of jurisdiction, if the district court during trial determines that the evidence of Amrep's control or domination of EUI, or Amrep's disregard of EUI's separate, independent, corporate existence, and evidence of Amrep's own other contacts with New Mexico are insufficient to constitute the minimum contacts required under due process, the court can dismiss for lack of jurisdiction at that point. *See Mimco Inc. v. Va. Iron & Metal Recycling, Inc.,* 840 F.Supp. 1171, 1174–75 (S.D.Ohio 1993) ("For the foregoing reasons the Court finds that the Plaintiff has met its burden of demonstrating facts which support a prima facie finding of jurisdiction. In doing so the Court makes no judgement concerning the merits of the parties' claims. Furthermore, the issue of personal jurisdiction may be raised again at the trial on the merits, after complete discovery, where further factual issues may be argued and where the Plaintiff bears the burden of proving personal jurisdiction by a preponderance of the evidence." (citation omitted)).

PICKARD, Judge (dissenting).

{49} I dissent from the majority's affirmance of the district court's denial of the motion to dismiss. In my opinion, neither Judge Kennedy's opinion nor Judge Sutin's opinion is supported by the authorities cited, their opinions are contrary to what I view to be the better reasoned of out-of-state cases, and their opinions would open the door to jurisdiction whenever there is a parent corporation of a subsidiary doing business in New Mexico unless the parent had nothing whatsoever to do with the subsidiary, which is virtually impossible as well as impractical.

{50} The beginning of Judge Kennedy's opinion suggests that *Cruttenden v. Mantura,* 97 N.M. 432, 434–35, 640 P.2d 932, 934–35 (1982), was a case involving the question of the substantive liability of a parent for the acts of its subsidiary. Kennedy op. ¶ 19. Yet, the opinion subsequently concludes that the case was about whether service on a parent would subject the subsidiary to the court's jurisdiction. Kennedy op. ¶ 27. Further, the opinion concludes that such is a question "entirely different" from that before us today. *Id.* While the issues are somewhat different, I am unable to conclude that they are so entirely different that *Cruttenden* does not lend any guidance to this case.

{51} In my view, the *Cruttenden* factors are the beginning of the analysis when one seeks to pierce the corporate veil, whether for jurisdictional or liability purposes. When evaluating for jurisdiction, piercing the corporate veil is sometimes known as the alter ego doctrine. *See Jemez Agency, Inc. v. CIGNA Corp.,* 866 F.Supp. 1340, 1343–45 (D.N.M.1994). Piercing the corporate veil has three requisites: instrumentality, improper purpose, and proximate causation. *Harlow v. Fibron Corp.,* 100 N.M. 379, 382, 671 P.2d 40, 43 (Ct.App.1983). As Judge

Sutin notes, the instrumentality requisite is sometimes called the alter ego doctrine. Sutin op. ¶ 43. *See Harlow,* 100 N.M. at 382, 671 P.2d at 43.

{52} In Judge Sutin's view, instrumentality is the only requisite that is relevant for jurisdictional purposes. Sutin op. ¶ 45. However, no New Mexico case has ever said that. It is true that *Cruttenden* addressed only instrumentality. 97 N.M. at 434–35, 640 P.2d at 934–35. But that case found no instrumentality and therefore "did not reach the question of improper purpose." *Harlow,* 100 N.M. at 382, 671 P.2d at 43. Cases are not authority for propositions not considered. *Fernandez v. Farmers Ins. Co.,* 115 N.M. 622, 627, 857 P.2d 22, 27 (1993).

{53} Other jurisdictions that have addressed the issue have unequivocally held that for purposes of personal jurisdiction, it is not sufficient to establish only instrumentality, and instead a plaintiff must also establish that the corporation that is using another corporation as its instrumentality has formed it or is using it to perpetrate a fraud or other injustice or for some other improper purpose. *See, e.g., Harris Rutsky & Co. Ins. Svcs., Inc. v. Bell & Clements Ltd.,* 328 F.3d 1122, 1134–35 (9th Cir.2003) ("To satisfy the alter ego exception to the general rule that a subsidiary and the parent are separate entities [for purposes of personal jurisdiction], the plaintiff must make out a prima facie case (1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." (internal quotation marks and citations omitted)); *Doe v. Unocal Corp.,* 248 F.3d 915, 926–28 (9th Cir.2001) (holding that a parent's ownership of subsidiary and facts that the same people served as directors of both companies and that a parent was involved in macro-management and finances of subsidiary did not satisfy first prong of alter ego test and thus the court did not need to reach second prong dealing with equities); *United Elec. Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1091–93 (1st Cir.1992) (deciding the question of personal jurisdiction using federal veil piercing standard for ERISA cases and holding that fraudulent intent and injustice are elements of the standard), *superseded by rule on other grounds as stated in Cent. States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.,* 230 F.3d 934, 940 (7th Cir. 2000); *ACE & Co. v. Balfour Beatty PLC,* 148 F.Supp.2d 418, 425 (D.Del.2001) (holding that Delaware law requires fraud, injustice, or inequity to be shown before the alter ego doctrine can be used to find personal jurisdiction over a parent corporation); *Medina v. Four Winds Int'l Corp.,* 111 F.Supp.2d 1164, 1168–69 (D.Wyo.2000) (same under Wyoming law); *Sonora Diamond Corp. v. Super. Ct.,* 83 Cal.App.4th 523, 99 Cal.Rptr.2d 824, 835–37 (2000) (indicating that California requires two factors to be met before corporate veil may be pierced for jurisdictional purposes—(1) unity of interest and ownership and (2) inequitable result caused by wrongdoing or fraud); *Flight Int'l Aviation Training Ctr., Inc. v. Rivera,* 651 So.2d 1265, 1266 (Fla.Dist.Ct.App.1995) (holding that wrongful or improper purpose must be shown for jurisdictional purposes). The reason for this rule is that corporations are formed precisely for the purpose of insulating the owners thereof and such purpose ought to be respected, whether for liability or jurisdiction, unless there are countervailing reasons not to do so. *See United Elec. Workers,* 960 F.2d at 1091; *Jemez Agency, Inc.,* 866 F.Supp. at 1347; *Sonora Diamond Corp.,* 99 Cal.Rptr.2d at 836.

{54} Judge Kennedy suggests that no New Mexico case has ever held that personal jurisdiction over an out-of-state parent of a subsidiary doing business in New Mexico must be supported by either the doctrines of alter ego, agency, or conspiracy. He characterizes the analysis in *Smith v. Halliburton Co.,* 118 N.M. 179, 186, 879 P.2d 1198, 1205 (Ct.App.1994), seeming to require some recognized theory in order to assert personal jurisdiction over a parent, as dicta. Kennedy op. ¶ 27. Although the Court did not find any recognized theory to be applicable to the facts of that case, I cannot say its analysis was entirely dicta.

{55} To be sure, we did not in that case specifically consider and reject the analysis

of *Energy Reserves Group, Inc. v. Superior Oil Co.*, 460 F.Supp. 483 (D.Kan.1978) (*Energy Reserves*), on which Judge Kennedy's opinion so heavily relies. But the fact that our Court considered it necessary to accept the traditional analysis indicates to me that it would not follow the *Energy Reserves* analysis, just as the New Mexico Federal District Court in *Jemez Agency, Inc.*, 866 F.Supp. at 1346–47, did not follow it.

{56} One important reason not to follow *Energy Reserves* in New Mexico is that that case was analyzing personal jurisdiction pursuant to the Kansas long-arm statute, which is considerably broader than New Mexico's. *Compare Energy Reserves*, 460 F.Supp. at 490 (indicating that the Kansas statute uses the phrase "agent or instrumentality"), *with* NMSA 1978, § 38–1–16(A) (1971) (permitting long-arm jurisdiction when certain things are done "in person or through an agent"); *see* Lonny Sheinkopf Hoffman, *The Case Against Vicarious Jurisdiction*, 152 U. Pa. L.Rev. 1023, 1036 (2004) (indicating that statutes that use the words "agent or instrumentality" are more expansive than statutes like New Mexico's that use only the word "agent").

{57} Although many of our cases contain language indicating that personal jurisdiction analysis considers only the outer boundaries of due process, *see, e.g., Santa Fe Techs., Inc. v. Argus Networks, Inc.*, 2002–NMCA–030, ¶ 13, 131 N.M. 772, 42 P.3d 1221, and cases cited therein, I am unaware of any case in which it was not clear that there was the doing of an act under the long-arm statute, whether the act was the transaction of business or the commission of a tort. I believe that it is important that our legislature used certain language in the statute and note that the legislature did not write that "New Mexico has jurisdiction whenever due process would allow it." *See generally* Hoffman, *supra* at 1036–37 (suggesting that using various substantive doctrines to invoke amenability to jurisdiction does not honor legislative intent); *Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F.Supp. 1458, 1465 (D.Del. 1991) ("In considering a recent Delaware Supreme Court decision, which stated that the Delaware long-arm statute confers jurisdic-

tion to the maximum extent allowable under the Due Process Clause, the . . . court stated that: 'the [Delaware] Supreme Court did not intend . . . to direct the trial court to ignore the specific words of [the long-arm statute] and to henceforth analyze all questions arising under [that statute] only in the broad terms of fundamental fairness that guide determination of the constitutional question. The Supreme Court commands that this statute be given a liberal construction so that its purpose is achieved, but it has not directed that the application of statutory words to the facts in hand be slighted.' " (citations omitted)).

{58} Thus, under the facts and allegations of this case, I conclude that the New Mexico long-arm statute requires the transaction of business by Amrep or its agent (or co-conspirator). Since the issues of agency or conspiracy are not before us, we are left with determining whether Amrep transacted any business.

{59} Prior to discussing Amrep's transaction of business, a brief digression into the agency and conspiracy theories may be helpful. As both Judge Kennedy's and Judge Sutin's opinions make clear, Plaintiffs do not rely on the agency theory. Kennedy op. ¶ 16; Sutin op. ¶ 41. Nonetheless, it is important to understand that the agency theory, for purposes of personal jurisdiction, goes far beyond the simple fact that a subsidiary is doing the parent's business under parent's general control. *See Sonora Diamond Corp.*, 99 Cal.Rptr.2d at 837–38. Instead, for the agency theory of jurisdiction to be found, it must be shown that the parent has "in effect taken over performance of the subsidiary's *day-to-day* operations[.]" *Id.* at 838. Perhaps the parties do not argue agency because there is clearly no sufficient showing of it in this case. Nor is there any contention of a conspiracy. I return then to the transaction of business.

{60} I do not believe that Amrep's formation of subsidiary corporations to do business in New Mexico can amount to Amrep's transaction of business; otherwise, every parent corporation would be amenable to suit, and there would be no call for doctrines such as alter ego or agency. Nor do I believe that

the shareholder parent's injection of capital into the subsidiary corporation or the corporations' sharing of key staff or officers is enough to amount to the transaction of business by the parent. I would hold that it is only if Plaintiffs can pierce the corporate veil of EUI that Amrep should be considered to have transacted EUI's business.

{61} I do not disagree with the other judges that, given the standard of review for jurisdictional issues when there is no evidentiary hearing, a court could find that Plaintiffs have just barely established a prima facie case of instrumentality under the *Cruttenden* factors. *See id.* at 434–35, 640 P.2d at 934–35. But Plaintiffs have not shown any sort of fraud, improper purpose, or inequity in the operation of EUI or Amrep's use of EUI as an independent water-utility corporation in this case, and our statute does not allow jurisdiction over an entity that transacts business through the use of an instrumentality. I would therefore reverse and order that the complaint against Amrep be dismissed and that Plaintiffs be required to have their remedy, if any, against the corporations doing business in New Mexico.