2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit



5-14-2009

# D'Jamoos v. Pilatus Aircraft Ltd

Precedential or Non-Precedential: Precedential

Docket No. 08-2690

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"D'Jamoos v. Pilatus Aircraft Ltd" (2009). *2009 Decisions*. Paper 1274.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1274

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————

No. 08-2690

—————


THERESA D'JAMOOS, As Executrix of the Estate of Dawn
Elizabeth Weingeroff;
FREDERICK L. WEINGEROFF, Administrator of the Estate
of Leland C. Weingeroff
& Executor of the Estate of Gregg C. Weingeroff;
STANLEY J. WACHTENHEIM, Executor of the Estate of
Jeffrey M. Jacober;
MICHAEL A. JACOBER; DAVID S. JACOBER, Co-
Executors of the
Estate of Karen L. Jacober & Co-Administrators of the Estate
of Eric B. Jacober

v.

PILATUS AIRCRAFT LTD.; PILATUS FLUGZEUGWEKE
AKTIENGESELLSCHAFT; ROSEMOUNT AEROSPACE,
INC.; REVUE THOMMEN AC; EMCA; GOODRICH
AVIONICS SYSTEMS, INC.; L-3 COMMUNICATIONS
CORPORATION; GOODRICH CORPORATION

Theresa D'Jamoos; Frederick L. Weingeroff;
Stanley J. Wachtenheim; Michael A. Jacober;
David S. Jacober,

<u>Appellants</u>

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 2-07-cv-01153)
Honorable Mary A. McLaughlin, District Judge

Argued March 5, 2009

BEFORE:  BARRY and GREENBERG, <u>Circuit</u> <u>Judges</u>,
and ACKERMAN, <u>District</u> <u>Judge</u>*

(Filed: May 14, 2009)

Anthony Tarricone
Joseph P. Musacchio
Kreindler & Kreindler LLP
277 Dartmouth Street
Boston, MA 02116

*The Honorable Harold A. Ackerman, Senior Judge of the
United States District Court for the District of New Jersey,
sitting by designation.

Valerie M. Nannery
John Vail (argued)

Center for Constitutional Litigation, P.C.
777 6th Street, N.W.
Suite 520
Washington, DC 20001-3723

Sol H. Weiss
Anapol, Schwartz, Weiss, Cohan, Feldman
& Smalley, PC
1900 Delancey Place
Philadelphia, PA 19103-0000

   Attorneys for Plaintiffs-Appellants

Bruce J. Berman (argued)
McDermott Will & Emery LLP
201 South Biscayne Boulevard
Suite 2200
Miami, FL 33131

Jeffrey Baltruzak
Jeffrey A. Rossman
McDermott Will & Emery LLP
227 West Monroe Street
Suite 5200
Chicago, IL 60606

J. Bruce McKissock
Marshall, Dennehey, Warner, Coleman & Goggin
18th Floor
1845 Walnut Street
Philadelphia, PA 19103

3

Attorneys for Defendant-Appellee Pilatus Aircraft Ltd.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

## I. INTRODUCTION

This matter comes on before this Court on an appeal from an order of the United States District Court for the Eastern District of Pennsylvania, entered on April 30, 2008, and made final by an order entered on May 27, 2008: (1) granting a motion by appellee Pilatus Aircraft Ltd. ("Pilatus")[1] to dismiss it as a defendant for lack of personal jurisdiction, and (2) denying appellants' motion to transfer the action to the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1631. D'Jamoos v. Pilatus Aircraft Ltd., No. 07-1153, 2008 U.S. Dist. LEXIS 35181 (E.D. Pa. Apr. 30, 2008). For the reasons that follow, we will affirm the order of the District Court to the extent that it held that it did not have jurisdiction over Pilatus, but will vacate the order of the District Court to the extent that it denied the motion to transfer the action to Colorado

---

[1]Pilatus is a single entity which appellants sued in the District Court under both its English and German names (Pilatus Aircraft, Ltd. and Pilatus Flugzeugweke Aktiengesellschaft).

and will remand the case to the District Court for further proceedings.


## II.  FACTS AND PROCEDURAL HISTORY

This action arose from tragic events on March 26, 2005, when a PC-12 turboprop aircraft that Pilatus had manufactured crashed while attempting to land in State College, Pennsylvania. The plane, piloted by Jeffrey Jacober, was carrying five passengers, and all six people on the plane were killed. At the time of the crash, the plane had been making a planned stop in Pennsylvania on its way from Florida to Rhode Island, where the six persons lived. This action, among others, followed.[2] The plaintiffs, now the appellants, are Rhode Island citizens and are the representatives of the decedents' Rhode Island estates.


### A.  The Manufacture and Distribution of PC-12s

Pilatus is a Swiss company based in Stans, Switzerland, where it has designed and manufactured single-engine aircraft since 1939. Pilatus makes planes for both the general aviation and military training aircraft markets. The PC-12 is a single-engine turboprop aircraft designed for the civilian, general

---

[2]The six plaintiffs each filed a separate action against the same defendants, but the District Court consolidated the cases. As a matter of convenience, we refer to the actions as a single case.

aviation market.

The majority of Pilatus's PC-12s ultimately are sold in the United States. In fact, Pilatus's Annual Report 2006 ("Annual Report") describes the United States as "unrivalled" among purchasers of PC-12s, having taken delivery of nearly two-thirds of the 670 PC-12s that Pilatus had built to date. App. at 103. Pilatus makes all sales of the PC-12 in the United States through its Colorado-based United States subsidiary, Pilatus Business Aircraft, Ltd. ("PilBAL"), which is responsible for all PC-12 sales in North and South America. PilBAL buys the planes from Pilatus, then sells them to contracted independent dealers, which, in turn, market and sell the PC-12s to retail customers in their respective geographic areas. Pilatus is not involved directly in the United States in the sale of its planes, as PilBAL and its independent dealers are responsible for the advertising and marketing of the PC-12s in this country. Moreover, Pilatus does not perform any maintenance in the United States on the planes it has manufactured. Pilatus asserts that it generally is not aware of when and where new PC-12s are sold to retail buyers after PilBAL purchases the planes, and that it generally is not aware of any subsequent resales of its planes.[3]

---

[3]Pilatus's own statements, however, belie its attempts to appear entirely disconnected from end-customers. In its Annual Report, Pilatus writes:

> Pilatus Aircraft in Stans is also a home base . . . for all our PC-12 customers worldwide. Because they know that whatever happens, they can expect support from Stans around the clock. This

Similarly, PilBAL claims that it generally is not aware of when and where the independent dealers ultimately sell the planes in their multi-state territories.

To obtain Federal Aviation Administration ("FAA") certification allowing PC-12 planes to be registered and flown in the United States, Pilatus equips its PC-12s with a stick-pusher system intended to prevent the planes from stalling and entering a spin, which would create a significant risk of crashing. The turboprop aircraft at issue in this case, Pilatus PC-12 S/N 299, included such a system. Appellants allege that the subject aircraft crashed because of the failure of its stick-pusher system and/or other components, as well as systems manufactured by other defendants not involved in this appeal.

In 1999, Pilatus manufactured the aircraft involved in the Pennsylvania crash at its Stans, Switzerland, facilities. Thereafter Pilatus sold the aircraft to a French buyer. Its owner then resold the plane to a Swiss company (not Pilatus), which resold it to a Massachusetts company. The Massachusetts company brought the plane to the United States in the spring of 2003 and sold it to J2W Aviation, LLC, a Rhode Island

---

> always has been and will continue to be our philosophy.

App. at 92. Confirming that it does not sever all ties to its planes when they leave the factory, Pilatus also states on its website that "[o]ur customer support is among the best in aviation and we are proud to offer this service around the globe over the lifecycle of a product." Id. at 80.

7

company which based the aircraft in Rhode Island. Pilatus was not involved in any of the aircraft's resales, and its only contact with the plane after its original sale was some maintenance of it in Switzerland at the request of its then owners. Pilatus, however, had no contact with the aircraft after it left Europe.

## B. Contacts with Pennsylvania

Pilatus contends that appellants cannot sue it in Pennsylvania because Pilatus has had almost no contacts within Pennsylvania. In this regard, it is undisputed that Pilatus never has had offices, mailing addresses, telephone numbers, facilities, employees, officers, directors, owners, shareholders, agents, assets, investments, bank accounts, or subsidiaries in Pennsylvania; Pilatus never has owned, leased, or used real property in Pennsylvania; and Pilatus never has registered to do business in Pennsylvania. In the last five years, Pilatus has not sold any aircraft to purchasers in Pennsylvania or shipped anything directly to persons or entities in Pennsylvania.[4] Pilatus has not advertised or marketed its products in Pennsylvania and did not design the PC-12 for the Pennsylvania market specifically, although it did target the United States market generally by designing the plane to ensure its compliance with FAA requirements. Within the five years preceding this

---

[4]We are not implying that before the five-year period it made such sales or shipments. We also note that the five-year period as such has no particular significance, but we refer to that period throughout our discussion of Pilatus's contacts within Pennsylvania because it is the time frame that Pilatus used in the affirmations it filed with its motion to dismiss.

litigation, however, Pilatus did have some direct contacts within Pennsylvania. In the early 2000s, Pilatus sent two employees to view displays at a potential supplier in Pennsylvania that Pilatus never used. Moreover, Pilatus purchased $1,030,139 in products, equipment, or services[5] from suppliers in Pennsylvania, an amount that represented less than one percent of Pilatus's total annual purchases for an approximately five-year period.

PilBAL also had some contacts within Pennsylvania during this time. From 2003 to 2007, PilBAL sold $600,000 worth of spare airplane parts to its independent dealer serving Pennsylvania, a Maryland company called SkyTech, Inc. At SkyTech's request, PilBAL shipped parts directly to Pennsylvania customers. In 2005, PilBAL paid $12,705.80 to place an advertisement in five or six[6] issues of Police and Security News, a national publication with offices in Quakertown, Pennsylvania.

The record does not contain any evidence of sales of PC-12s in Pennsylvania by Pilatus, PilBAL, or SkyTech.

_____

[5]The record does not specify what products, equipment, or services Pilatus purchased from Pennsylvania suppliers.

[6]An affirmation of Martha Geisshuesler, an officer of PilBAL, in the record is unclear with respect to how many times the advertisement ran. It notes that "[t]he advertisement ran in five issues," but that "PilBAL paid $12,705.80 for the six spots." App. at 173. The difference is of no significance on this appeal.

9

Nevertheless, an owner-operator list that Pilatus maintains for warranty purposes shows that some of its planes have ended up in Pennsylvania and some may have been resold there. At the time of Pilatus's motion to dismiss, four PC-12s and four other Pilatus planes were based in Pennsylvania,[7] but the record does not show how the four PC-12s reached Pennsylvania.

C. Contacts with Colorado

Although Pilatus itself[8] is not registered to do business in Colorado, it conducts nearly $200 million[9] in annual business there in transactions with PilBAL, its wholly-owned, Colorado-based subsidiary, which it founded specifically to provide "completions, marketing, sales, and service for Pilatus aircraft in North and South America." App. at 83. Pilatus's relationship with Colorado is highly profitable, and in 2005 and 2006,

---

[7]There is some confusion in the record as to whether four or seven PC-12s are registered in Pennsylvania, but the parties seem to believe that seven is the correct number. The outcome of this appeal does not depend on four or seven being the correct number.

[8]Because appellants have not pleaded sufficient facts to support a finding to the contrary, we treat Pilatus and PilBAL as distinct corporate entities.

[9]According to Pilatus's Annual Report, PilBAL grossed just over 245 million Swiss francs in each of 2005 and 2006, which converted to nearly $200 million per year based on the conversion rates listed in the report for those years.

approximately half of Pilatus's revenue originated with PilBAL. According to Pilatus's Annual Report, PilBAL, "[a]s in past years . . . made the biggest contribution to the total annual sales figures" of the company, selling 61 PC-12s, or over two-thirds of the 90 such aircraft sold in 2006, while at the same time receiving a record number of orders for new aircraft as well. Id. at 105. Of the 61 aircraft PilBAL sold, 54 were sold in the United States. The report indicates that more than 430 of the 600-plus PC-12s in operation worldwide had been completed[10] and delivered in the United States, and that PilBAL's gross sales had amounted to 53.1% of Pilatus's overall gross sales in 2005 and 43% in 2006.

D. The District Court's Decision

Appellants brought this action on March 22, 2007, when they sued Pilatus and several manufacturers of the aircraft's component parts in the United States District Court for the Eastern District of Pennsylvania, asserting against each defendant claims predicated on products liability, negligence, and breach of warranty. On December 7, 2007, Pilatus moved to dismiss the complaint for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), among other grounds, and filed supporting affirmations. Appellants did not request jurisdictional discovery to oppose the motion, but, instead, relied on publicly available information for that purpose. Consequently, the jurisdictional facts the parties submitted on the motion essentially are undisputed.

---

[10]The record does not describe the services PilBAL performed in the "completion" of PC-12s in Colorado.

Nearly two weeks after oral argument on the motion to dismiss in the District Court, appellants filed an action in the United States District Court for the District of New Hampshire against Pilatus asserting the same claims that it has made in this case.[11] In New Hampshire, however, appellants requested to have the opportunity to pursue jurisdictional discovery, and the court has granted that request. See D'Jamoos v. Pilatus Aircraft, Ltd., No. 08-108, 2008 U.S. Dist. LEXIS 96562 (D.N.H. Nov. 25, 2008). One day after its New Hampshire filing, appellants moved in the Pennsylvania District Court to transfer this action to Colorado pursuant to 28 U.S.C. § 1631.

On April 30, 2008, the District Court granted Pilatus's motion to dismiss and denied appellants' motion to transfer the action to Colorado. Based on the undisputed factual record, the Court found that Pennsylvania lacked specific jurisdiction over Pilatus in this action. D'Jamoos, 2008 U.S. Dist. LEXIS 35181, at *10-21. Noting that the aircraft had entered Pennsylvania via a series of third-party resales unconnected to Pilatus, the Court found that Pilatus lacked the requisite minimum contacts within Pennsylvania to support the exercise of specific jurisdiction. The Court concluded that Pilatus had not purposefully availed itself of the privilege of conducting business within Pennsylvania, and that "[t]his single, isolated incident involving a product that Pilatus sold in Europe is not enough to support jurisdiction in Pennsylvania." Id. at *15-16. The Court also found that the factual record did not support personal

_____

[11]Appellants also sued the plane's aircraft maintenance company in New Hampshire, but we are not concerned with the theory of the claim against it.

12

jurisdiction over Pilatus under any of the Supreme Court's stream-of-commerce tests, and that, in any event, a stream-of-commerce analysis was "not entirely apposite in this case, because the subject aircraft did not enter Pennsylvania through any stream of commerce." Id. at *19.

The District Court also concluded that neither Pilatus nor PilBAL had the "continuous and systematic" contacts necessary to subject Pilatus to general jurisdiction in Pennsylvania. Id. at *22. Finally the Court denied the motion to transfer, concluding that appellants failed to show that Colorado had general jurisdiction over Pilatus, much less the other remaining defendants. Id. at *27-37.

Although the dismissal of Pilatus from the action did not complete the litigation, as it still was pending against the other defendants, the District Court subsequently entered final judgment in its favor pursuant to Fed. R. Civ. P. 54(b). Appellants then timely appealed from that judgment to this Court. The District Court has stayed the case pending disposition of this appeal.

III.  JURISDICTION AND STANDARD OF REVIEW

The District Court's subject-matter jurisdiction rested on diversity of citizenship between appellants and each of the eight defendants, including Pilatus, pursuant to 28 U.S.C. § 1332(a)(2).  We have appellate jurisdiction under 28 U.S.C. § 1291.  We exercise plenary review over the District Court's

13

determination that Pennsylvania lacked personal jurisdiction over Pilatus.  See O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 316 (3d Cir. 2007).  Similarly, because the Court based its denial of the transfer motion solely on its conclusion of law that Colorado courts would lack personal jurisdiction over Pilatus, we also review that determination de novo.

## IV.  DISCUSSION

Appellants challenge the District Court's decision: (1) granting Pilatus's motion to dismiss for lack of personal jurisdiction, and (2) denying appellants' motion to transfer the action to Colorado pursuant to 28 U.S.C. § 1631.  We will deal with each issue in turn.

### A.     Specific Jurisdiction Over Pilatus in Pennsylvania

Once a defendant challenges a court's exercise of personal jurisdiction over it, the plaintiff bears the burden of establishing personal jurisdiction.  Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001).  However, inasmuch as the District Court in this case did "not hold an evidentiary hearing . . . , the plaintiff[s] needed only [to] establish a prima facie case of personal jurisdiction and the plaintiff[s were] entitled to have [their] allegations taken as true and all factual disputes drawn in [their] favor."  Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004).

"A federal district court may assert personal jurisdiction

14

over a nonresident of the state in which the court sits to the extent authorized by the law of that state." Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 436 (3d Cir. 1987). Because this case comes on before this Court on an appeal from the United States District Court for the Eastern District of Pennsylvania, we apply the Pennsylvania long-arm statute, which provides for jurisdiction "based on the most minimum contact with th[e] Commonwealth allowed under the Constitution of the United States." 42 Pa. Cons. Stat. Ann. § 5322(b) (West 2004); see O'Connor, 496 F.3d at 316. Accordingly, in determining whether there is personal jurisdiction, we ask whether, under the Due Process Clause, Pilatus has "certain minimum contacts with [Pennsylvania] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158 (1945) (internal quotation marks omitted).

There are two types of personal jurisdiction, general jurisdiction and specific jurisdiction, the second of which is concerned solely with the jurisdiction in the action at bar. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15, 104 S.Ct. 1868, 1872 (1984). Thus, it is entirely possible that a court might have personal jurisdiction in a particular case over a defendant but not have jurisdiction over it in other cases. Inasmuch as appellants do not contend on this appeal that Pilatus's contacts within Pennsylvania support the exercise of general jurisdiction over it, the issue before us is whether Pilatus is subject to specific jurisdiction in this action

15

in Pennsylvania.[12]

In determining whether there is specific jurisdiction, we undertake a three-part inquiry.  First, the defendant must have "purposefully directed [its] activities" at the forum.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S.Ct. 2174, 2182 (1985) (internal quotation marks omitted).  Second, the litigation must "arise out of or relate to" at least one of those activities.  Helicopteros, 466 U.S. at 414, 104 S.Ct. at 1872; O'Connor, 496 F.3d at 317.  And third, if the first two requirements have been met, a court may consider whether the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'"  Burger King, 471 U.S. at 476, 105 S.Ct. at 2184 (quoting Int'l Shoe, 326 U.S. at 320, 66 S.Ct. at 160).

The first two parts of the test determine whether a defendant has the requisite minimum contacts with the forum. The threshold requirement is that the defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240 (1958).  To meet this requirement, the defendant's physical entrance into the forum is not necessary.  See Burger King, 471 U.S. at 476, 105 S.Ct. at 2184; Grand Entm't Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 482 (3d Cir. 1993).  A defendant's contacts, however, must amount to "a deliberate targeting of the forum."

[12]In the District Court appellants did argue that the Pennsylvania District Court had both specific and general jurisdiction over Pilatus.

16

O'Connor, 496 F.3d at 317.  The "unilateral activity of those who claim some relationship with a nonresident defendant" is insufficient.  Hanson, 357 U.S. at 253, 78 S.Ct. at 1239-40.

The record before us conclusively establishes that Pilatus's direct contacts within Pennsylvania are quite limited.  Certainly, the aircraft at issue in this case entered Pennsylvania's airspace and crashed there, and all six people on board were killed in Pennsylvania.  Yet we cannot link these events to Pilatus's deliberate activities aimed at Pennsylvania.  Although Pilatus designed and manufactured the subject aircraft, it did so in Switzerland and then sold the plane in Europe.[13]  The aircraft later reached the United States via a series of third-party resales in which Pilatus was not involved, only arriving in Pennsylvania because it was making a stopover on an interstate flight.  Pilatus did not profit from activities in Pennsylvania as a result of the aircraft's initial sale or resales.  And although a small number of Pilatus's PC-12s are based in Pennsylvania, there is no record evidence indicating how those planes reached Pennsylvania.  Certainly, we have no basis to believe that Pilatus sent the planes to Pennsylvania.

Appellants contend that by designing and manufacturing its planes to meet FAA standards, Pilatus purposefully availed

---

[13]Though the District Court said that the sale was in Switzerland, we do not know in a strict legal sense whether the sale was in France or Switzerland (or possibly elsewhere), but this point is of no significance on this appeal as the sale surely was not in Pennsylvania or, for that matter, in the United States.

17

itself of Pennsylvania law inasmuch as FAA standards govern aviation in Pennsylvania. Further, appellants argue that Pilatus benefitted from the fact that the State of Pennsylvania could not exclude the plane from its airspace, a fact on which Pilatus relied and profited when it sold the plane to a French buyer.[14] Of course, these arguments could apply to a claim that there would be jurisdiction over Pilatus in any state in the nation; indeed, appellants claim that because Pilatus targets the United States market as a whole, it has a purposeful affiliation with every state and must expect to be sued in any state where one of its aircraft crashes.

We acknowledge that there is a certain reasonableness to an argument that a manufacturer should be subject to suit in a jurisdiction in which its plane crashes if the suit charges that a manufacturing defect caused the crash. After all, would it be fair in a case in which an uninvolved person on the ground suffered a loss by reason of a plane crash to require that person to bring his or her damage action in some other possibly far-away jurisdiction? Yet it is clear that the critical finding that the defendant purposefully availed itself of the privilege of conducting activities within the forum requires contacts that amount to a deliberate reaching into the forum state to target its citizens. See Burger King, 471 U.S. at 475-76, 105 S.Ct. at

---

[14]We do not think that the factual basis for appellants' argument is farfetched; it would be useful for a potential European buyer who intended to use the airplane in Europe, when considering whether to make the purchase, to take into account the places in which there could be a resale market for the plane.

2184; O'Connor, 496 F.3d at 317-18. Pilatus's efforts to exploit a national market necessarily included Pennsylvania as a target, but those efforts simply do not constitute the type of deliberate contacts within Pennsylvania that could amount to purposeful availment of the privilege of conducting activities in that state. Rather, any connection of Pilatus to Pennsylvania merely was a derivative benefit of its successful attempt to exploit the United States as a national market.

We are aware of appellants' argument that the subject aircraft's value (and thus Pilatus's initial profit) was enhanced by the fact that the aircraft could travel in or be sold in Pennsylvania, but the Supreme Court in World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559 (1980), rejected a parallel argument. In Woodson, which addressed the New York sale by a New York retailer of an automobile that ultimately caused injury in Oklahoma, the plaintiffs argued "that the purchase of automobiles in New York, from which the petitioners earn substantial revenue, would not occur but for the fact that the automobiles are capable of use in distant States like Oklahoma." Id. at 298, 100 S.Ct. at 568. The Court concluded that

> financial benefits accruing to the defendant from a collateral relation to the forum State will not support jurisdiction if they do not stem from a constitutionally cognizable contact with that State. In our view, whatever marginal revenues petitioners may receive by virtue of the fact that their products are capable of use in Oklahoma is far too attenuated a contact to justify that State's

exercise of in personam jurisdiction over them.

Id. at 299, 100 S.Ct. at 568 (citation omitted). We acknowledge that the PC-12 is a highly mobile product capable of crossing international and state lines and that Pilatus designed it specifically to meet federal requirements that were a prerequisite to its use in all 50 states. Nonetheless, although the circumstance that the State of Pennsylvania cannot exclude Pilatus's planes is beneficial to Pilatus, the State of Pennsylvania does not confer that benefit, and the benefit "do[es] not stem from a constitutionally cognizable contact with that State." See id.

Pilatus's direct contacts within Pennsylvania, then, are limited to: (1) sending two employees to Pennsylvania to view displays at a potential supplier, and (2) purchasing $1,030,139 in goods or services from suppliers in Pennsylvania during the five-year period preceding this litigation. But even if these contacts could constitute purposeful availment of the privilege of conducting activities in Pennsylvania, appellants do not allege that their claims "arise out of or relate to" these direct contacts within Pennsylvania, see Helicopteros, 466 U.S. at 414, 104 S.Ct. at 1872, and the record could not support a finding that they did. Therefore, appellants cannot satisfy the second stage of the minimum contacts inquiry, which requires appellants to establish that their claims arise out of or relate to at least one of Pilatus's purposeful contacts with the forum.

As an alternative basis for supporting jurisdiction, appellants contend that Pilatus has minimum contacts within Pennsylvania under a stream-of-commerce theory. Courts have

20

relied on the stream-of-commerce theory to find a basis for personal jurisdiction over a non-resident defendant, often a manufacturer or distributor, which has injected its goods into the forum state indirectly via the so-called "stream of commerce."[15] See Pennzoil Prods. Co. v. Colelli & Assocs., 149 F.3d 197, 203 (3d Cir. 1998); Max Daetwyler Corp. v. R. Meyer, 762 F.2d 290, 298-300 (3d Cir. 1985).

Appellants contend that Pilatus injected its planes into the

---

[15]In Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 107 S.Ct. 1026 (1987), the Supreme Court sought to clarify the elements of jurisdiction under the stream-of-commerce theory. A majority of the Court, however, could not agree on the contours of what constitutes "purposeful availment" in the stream-of-commerce context, and thus its fragmentation did not allow the adoption of bright-line rules. The two plurality opinions in Asahi, Justice O'Connor's and Justice Brennan's, produced two distinct frameworks for the minimum contacts analysis as it relates to stream-of-commerce theory, and we have not had occasion to choose between the O'Connor and Brennan positions. See Pennzoil Prods. Co. v. Colelli & Assocs., 149 F.3d 197, 207 n.13 (3d Cir. 1998) (concluding that "[s]ince the facts of this case satisfy the standards of both Asahi Metal pluralities, we do not have occasion to select one standard or the other as the law of this circuit"); Renner v. Lanard Toys Ltd., 33 F.3d 277, 283-84 (3d Cir. 1994) (remanding for further discovery without reaching the issue of which Asahi standard should control). Once again, we need not decide this issue; as we will discuss, a stream-of-commerce analysis is inapposite on the facts presented here.

21

stream of commerce expecting that they would reach the United States. By adding to that contention the highly mobile nature of the PC-12, which is designed for interstate travel and which Pilatus promotes as an "'SUV' of the skies," App. at 94, appellants argue it was wholly foreseeable to Pilatus that one of its planes ultimately could cause injury in Pennsylvania. But even if we accept these contentions, the stream-of-commerce theory does not provide a basis for jurisdiction in this case.

As an initial matter, "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." Woodson, 444 U.S. at 295, 100 S.Ct. at 566. Instead, the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there. Id. at 297, 100 S.Ct. at 567. As we noted above, Pilatus's "conduct and connection with" Pennsylvania fail to meet this standard. See id. Moreover, the Supreme Court in Woodson squarely dismissed the contention appellants make in this case that the foreseeability analysis necessarily is influenced by the highly mobile nature of the product at issue. Id. at 296 n.11, 100 S.Ct. at 567 n.11 ("[W]e see no difference for jurisdictional purposes between an automobile and any other chattel.").

In any event, it is absolutely fatal to appellants' stream-of-commerce argument that the subject aircraft did not actually enter Pennsylvania through a "stream of commerce" as that term is generally understood — i.e., "the regular and anticipated flow

22

of products from manufacture to distribution to retail sale." See Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 117, 107 S.Ct. 1026, 1034 (1987) (Brennan, J., concurring). Any "stream" of planes from Pilatus to Pennsylvania would begin with Pilatus's manufacture of them and be followed by Pilatus's sale to them to PilBAL. Then PilBAL would distribute the planes to SkyTech, and finally SkyTech would sell the planes to buyers in Pennsylvania. It is by this path - from the Swiss manufacturing facility to PiBAL to regional dealer to end purchaser - that Pilatus targets the American market and intends and expects its aircraft to reach customers in the United States, including, arguably, those in Pennsylvania.

If the claim in this case had arisen out of these efforts to serve, even indirectly, the Pennsylvania market, then it would make sense to evaluate Pilatus's conduct under the stream-of-commerce theory. See Woodson, 444 U.S. at 297, 100 S.Ct. at 567 (stating that, if the sale of a product "arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others"). It is undisputed, however, that the aircraft involved in this case did not follow the foregoing regular and anticipated path to Pennsylvania. Rather, Pilatus sold the aircraft to a French buyer who resold it to a Swiss company (not Pilatus) that, in turn, resold it to a Massachusetts company that brought it to the United States and sold it to the Rhode Island company, its owner at the time of the accident.

By arguing that a stream-of-commerce analysis could

23

support jurisdiction even when the product at issue did not go through the "stream," appellants essentially ask us to find that the stream-of-commerce theory provides an independent source of personal jurisdiction over Pilatus, a source unrelated to appellants' claims. However, the fact that other Pilatus planes have followed a certain path to Pennsylvania and other states cannot provide the necessary connection between Pilatus and Pennsylvania to support specific jurisdiction in this case, because the aircraft involved here reached Pennsylvania by a series of fortuitous circumstances independent of any distribution channel Pilatus employed. If we held otherwise, we impermissibly would remove the "arising from or related to" requirement from the specific jurisdiction test and unjustifiably would treat the stream-of-commerce theory as a source of general jurisdiction. See Purdue Research Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 788 (7th Cir. 2003) (holding that stream-of-commerce theory "is relevant only to the exercise of specific jurisdiction; it provides no basis for exercising general jurisdiction over a nonresident defendant"); Bearry v. Beech Aircraft Co., 818 F.2d 370, 375 (5th Cir. 1987) ("A conclusion that there is a stream of commerce ensures that the contact that caused harm in the forum occurred there through the defendant's conduct and not the plaintiff's unilateral activities; it does not ensure that defendant's relationship with the forum is continuous and systematic, such that it can be sued there for unrelated claims.").

Because we conclude that appellants fail to establish that Pilatus had the required minimum contacts within Pennsylvania, we do not consider, under the third prong of a specific jurisdiction analysis, whether the exercise of specific

24

jurisdiction over Pilatus "would comport with 'fair play and substantial justice.'" Burger King, 471 U.S. at 476, 105 S.Ct. at 2184 (quoting Int'l Shoe, 326 U.S. at 320, 66 S.Ct. at 160).

B. General Jurisdiction over Pilatus in Colorado

Appellants also challenge the District Court's denial of its motion to transfer the case to Colorado pursuant to 28 U.S.C. § 1631. Under section 1631, when a district court finds that it is lacking jurisdiction,

> the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.

28 U.S.C. § 1631; see also Island Insteel Sys., Inc. v. Waters, 296 F.3d 200, 218 & n.9 (3d Cir. 2002) (noting that section 1631 permits transfer for lack of in personam jurisdiction). Inasmuch as the District Court concluded that appellants failed to show that Colorado had personal jurisdiction over Pilatus, much less the other defendants, it believed that it could not transfer the case to Colorado as section 1631 permits a transfer of a case only to a court in which the case originally could have been brought. In concluding that Colorado did not have personal jurisdiction over Pilatus, the Court rejected Pilatus's

25

ownership of PilBAL, its Colorado-based subsidiary, as a basis for jurisdiction. Because the Court predicated its denial of appellants' motion solely on its conclusion that Colorado lacked personal jurisdiction over Pilatus, that determination is a conclusion of law over which we exercise plenary review.

Inasmuch as district courts may exercise personal jurisdiction over nonresident defendants to the extent authorized under the law of the forum state in which the district court sits, Provident National Bank, 819 F.2d at 436, we look to Colorado law to determine whether a Colorado court could exercise jurisdiction over Pilatus. Colorado's long-arm statute, like Pennsylvania's with respect to its courts, extends the jurisdiction of Colorado courts to the maximum limit permitted by the due process clauses of the United States and the state, i.e., Colorado, constitutions. Goettman v. N. Fork Valley Rest. (In re Goettman), 176 P.3d 60, 67 (Colo. 2007). If the exercise of jurisdiction is consistent with due process, Colorado's long-arm statute therefore authorizes a court to exercise jurisdiction over a defendant. Id.

Inasmuch as appellants do not contend that the Colorado courts would have specific jurisdiction in this case, but, instead contend that the Colorado courts have general jurisdiction over Pilatus, we turn our focus to that basis for the exercise of personal jurisdiction. General jurisdiction depends on a defendant having maintained "continuous and systematic" contacts with the forum state. Helicopteros, 466 U.S. at 415-16, 104 S. Ct. at 1872-73. In determining whether a foreign corporate defendant has the requisite continuous and systematic contacts with the forum, the Court of Appeals for the Tenth

26

Circuit considers: (1) whether the corporation solicits business in the state through a local office or agents; (2) whether the corporation sends agents into the state on a regular basis to solicit business; (3) the extent to which the corporation holds itself out as doing business in the forum state through advertisements, listings or bank accounts; and (4) the volume of business conducted in the state by the corporation. See Doering v. Copper Mountain, Inc., 259 F.3d 1202, 1210 (10th Cir. 2001); Kuenzle v. HTM Sport-Und Freizeitgerate AG, 102 F.3d 453, 457 (10th Cir. 1996).

We are satisfied that the record demonstrates that appellants have established a prima facie basis for a conclusion that a Colorado court may exercise general jurisdiction over Pilatus predicated on its direct contacts within Colorado or, alternatively, on the conduct of PilBAL as its agent.

The record supports a finding that Pilatus maintains substantial direct contacts with Colorado through the nearly $200 million in annual business it conducts with PilBAL, its wholly-owned subsidiary based in Broomfield, Colorado, though we recognize that volume of business alone is not dispositive of the jurisdictional question. See Helicopteros, 466 U.S. at 418, 104 S.Ct. at 1874 (holding that mere purchases from suppliers in the forum state and incidental related contacts were not sufficiently substantial to support the exercise of general jurisdiction). Contrary to the findings of the District Court, however, it is clear that PilBAL is far more to Pilatus than just a good customer. As Pilatus's only United States subsidiary, PilBAL's raison d'être is "to provide completions, marketing, sales, and service for Pilatus aircraft in North and

27

South America." App. at 83. PilBAL is responsible for marketing and sales of only one of Pilatus's products, the PC-12. The PC-12s that PilBAL buys from Pilatus are sent from Switzerland to PilBAL's facilities in Colorado, where PilBAL actually "completes" the aircraft before selling them to its network of independent dealers throughout North and South America. In the normal course of business, therefore, Pilatus sells and transports or has transported to Colorado every PC-12 aircraft destined for an end-customer in the Americas. Moreover, Pilatus's Annual Report emphasizes that "[n]or were [PilBAL's] activities in the 2006 business year merely restricted to selling." Id. at 105. Rather, "[t]he company worked intensively on technical innovations and new developments," launching updated features for the PC-12 that included the option of a new type of door, more advanced monitoring equipment, and an enhanced vision system. Id.

Pilatus's Colorado relationship is financially very significant; in 2005 and 2006, approximately half of Pilatus's revenue originated with PilBAL. Pilatus's Annual Report stated that PilBAL "[a]s in past years . . . made the biggest contribution to the total annual sales figures: 61 PC-12s in 2006, or just over two-thirds of the 90 aircraft sold [worldwide]." Id. The Annual Report indicated:

> The ten-year anniversary of [PilBAL], celebrated in Broomfield on 5 May 2006, was also a special occasion. The following statistic exemplifies this subsidiary's performance: more than 430 of the over 600 PC-12s in operation worldwide to this date were completed and delivered in the United

28

States.

Id.  In aggregate, these factors support a finding that the manner in which Pilatus transacts a substantial portion of its annual business within Colorado is both systematic and continuous. Therefore, appellants have made a prima facie showing that, given Pilatus's direct contacts within Colorado, the exercise of general jurisdiction over Pilatus in Colorado would comport with due process.

Alternatively, in analyzing the relationship between Pilatus and PilBAL according to principles of agency, we recognize that for a plaintiff to defeat a motion to dismiss for lack of personal jurisdiction when the plaintiff relies on agency theory, it "need only make a prima facie showing of the connection between the actions of the agent and the principal." In re Goettman, 176 P.3d at 68.  Based on the record before us, we find sufficient information to support a prima facie showing that the courts in Colorado can exercise general jurisdiction over Pilatus under agency principles.

The concept underlying the agency theory of personal jurisdiction is the familiar principle that a principal is responsible for the actions of its agent.  Id. at 67.  "[A]s all corporations must necessarily act through agents, a wholly owned subsidiary may be an agent and when its activities as an agent are of such a character as to amount to doing business of the parent, the parent is subjected to the in personam jurisdiction of the state in which the activities occurred." Curtis Publishing Co. v. Cassel, 302 F.2d 132, 137 (10th Cir. 1962); accord First Horizon Merch. Servs. v. Wellspring Capital Mgmt., LLC, 166

29

P.3d 166, 177 (Colo. Ct. App. 2007).

As we have noted, Pilatus founded PilBAL "to provide completions, marketing, sales, and service for Pilatus aircraft in North and South America." App. at 83. By serving as its United States-based middleman, PilBAL enables Pilatus to reach the large United States market, which its Annual Report makes clear is critical to Pilatus's core business. Pilatus, meanwhile, is not merely a disinterested holding company, with ownership of diversified corporate investments — Pilatus is in the business of manufacturing and selling airplanes.[16] Compare SGI Air Holdings II LLC v. Novartis Int'l AG, 239 F. Supp. 2d 1161, 1169 (D. Colo. 2003) (finding agency relationship sufficient to support exercise of personal jurisdiction where subsidiary's business mirrored a "core business" of parent) with Quarles v. Fuqua Indus., Inc., 504 F.2d 1358, 1364 (10th Cir. 1974) (finding no jurisdictional predicate where subsidiary, an operator of adult vocational training schools, did not engage in parent holding company's "business of diversified corporate investments"). These facts support the conclusion that PilBAL exists to conduct Pilatus's business in North and South America. Moreover, as the exclusive Pilatus subsidiary in the Americas — Pilatus's most significant territory by far — PilBAL fairly could be described as the "source of life" to Pilatus's operations. See Curtis Publishing, 302 F.2d at 136, 138 (finding that subsidiary was agent of parent for jurisdictional purposes where the subsidiary had exclusive rights to distribute the parent's

---

[16]Additionally, the same individual serves as Chairman of the Board of Directors for both Pilatus and PilBAL, and the former CEO of PilBAL later became the CEO of Pilatus.

magazines worldwide; because circulation of its publications was the "source of life" to parent, subsidiary was conducting parent's business); SGI, 239 F. Supp. 2d at 1169 (where subsidiary's business was "essential" to parent's business, parent had "assumed the risks" of subsidiary's business ventures and, thus, subsidiary was general agent of parent for jurisdictional purposes).

The record makes it clear that the business PilBAL is conducting drives Pilatus's manufacturing activities. In 2006, demand for the PC-12 "far exceeded supply," App. at 105, and sales were limited only by the fact that Pilatus could manufacture but 90 aircraft per year. By the end of the 2006 business year, Pilatus had received 166 orders for new PC-12s, exceeding its production capability for 2007 and meaning that any new customers would "have to wait one-and-a-half years after placing their order before receiving their longed-for PC-12." Id. at 103. Of those orders, 121 — over 70 percent — came through PilBAL. Pilatus, therefore, does not manufacture aircraft in the vague hope that someone, somewhere will purchase them; rather, it manufactures aircraft to fill specific, pre-existing orders, most of which originate with PilBAL.[17] The fact that Pilatus's PC-12s essentially are made-to-order underscores PilBAL's status as the "source of life" to Pilatus's operations. In sum, we find the record evidence pertaining to agency sufficient to establish prima facie that PilBAL's activities in Colorado amount to doing the business of Pilatus,

---

[17]In fact, the Annual Report even suggests that PC-12s can be ordered with personalized options, including paint in company colors.

and that a Colorado court therefore could exercise general jurisdiction over Pilatus.[18]

C.    Requirements for Transfer

Although we conclude that this action could have been

_____

[18]We are aware that the Colorado Supreme Court recently rejected the exercise of general jurisdiction in Colorado, under agency principles, in a case involving a parent-subsidiary relationship similar to that between Pilatus and PilBAL. See In re Goettman, 176 P.2d at 68. In Goettman, the subsidiary was the sole United States purchaser and distributor of its Australian parent's products. However, the subsidiary was not based in Colorado, but was headquartered in Pennsylvania and incorporated in Delaware. The Goettman court, moreover, discussed only two contacts within Colorado — (1) the subsidiary's sale and distribution of one product to a Colorado company, and (2) the dispatch of two technical support people, one from the parent and one from the subsidiary, to Colorado to service that product. Id. at 64-65. The parent's contacts within the forum state in Goettman, therefore, were less than the equivalent of the direct and substantial contacts we find here, and the case is wholly distinguishable. We recognize that the Colorado Supreme Court did not discuss the "source of life" or "doing business of the parent" theories, and thus we are not certain that it would apply Curtis Publishing in the same way that the Colorado district court did in SGI. See 239 F. Supp. 2d at 1169. We find, nevertheless, that the facts presented here amount to a prima facie case for general jurisdiction in Colorado.

32

brought against Pilatus in Colorado, our conclusion only partially satisfies the requirements for a transfer under section 1631, for a court can order a transfer only if it is "in the interest of justice to do so," an issue that the District Court should address on the remand that we will direct in this case. In deciding that question, the District Court should consider, on either its own or appellants' motion pursuant to Fed. R. Civ. P. 21, whether the claims as to the non-Pilatus defendants should be severed in order to permit the transfer of the claims against Pilatus.

The District Court believed that "[a] plaintiff must be able to establish that personal jurisdiction exists over each defendant in the transferee district." 2008 U.S. Dist. LEXIS 31581, at *31 n.8. This statement truncates the required analysis and suggests that the District Court did not realize that, under our precedent, transfer of the entire action was not its only option. Quite to the contrary, we have interpreted section 1631 to permit the transfer of all or only part of an action. See Miller v. United States, 753 F.2d 270, 275-76 (3d Cir. 1985) (allowing transfer of part of an appeal to the United States Court of Appeals for the Federal Circuit); see also United States v. County of Cook, 170 F.3d 1084, 1087-89 (Fed. Cir. 1999) (concluding that transfer of less than an entire action is proper under section 1631). But see Hill v. United States Air Force, 795 F.2d 1067, 1070-71 (D.C. Cir. 1986) (concluding that section 1631 "directs a court to transfer an 'action' over which it lacks jurisdiction, rather than an individual claim"). Moreover, in applying 28 U.S.C. § 1404(a), which as the District Court acknowledged is comparable to section 1631, we have held that where a case could have been brought against

33

some defendants in the transferee district, the claims against those defendants may be severed and transferred while the claims against the remaining defendants, for whom transfer would not be proper, are retained. White v. ABCO Eng'g Corp., 199 F.3d 140, 144 (3d Cir. 1999) ("Nothing within § 1404 prohibits a court from severing claims against some defendants from those against others and transferring the severed claims."). The District Court should have regarded the logic of Miller and White as controlling here.

We recognize that Miller involved a situation in which two different courts of appeals had subject matter jurisdiction over different appeals of a single party's claims. Clearly our reasoning in White, however, encompasses the situation here. As in White, the course of action we propose to the District Court actually is not a partial transfer at all inasmuch as the action, once severed, may be regarded as two or more separate and independent actions, each of which is then transferrable — or not — pursuant to the terms of section 1631. Thus, it is evident that the District Court may sever the claims against Pilatus and transfer them to Colorado, regardless of its treatment of the claims against the non-Pilatus defendants.[19]

---

[19]In so holding, we acknowledge that because appellants did not request a severance, these issues were not framed properly before the District Court. We also recognize that the District Court's discussion on the transfer subject was dicta, because its conclusion that Colorado lacked jurisdiction over Pilatus compelled the denial of the transfer motion as to Pilatus in any event.

Nevertheless, before dividing the case, the District Court should weigh the factors favoring transfer against the potential inefficiency of requiring the similar and overlapping issues to be litigated in two separate forums. See White, 199 F.3d at 144-45; Sunbelt Corp. v. Noble, Denton & Assocs., 5 F.3d 28, 33-34 (3d Cir. 1993) (stating that a court "'should not sever if the defendant over whom jurisdiction is retained is so involved in the controversy to be transferred that partial transfer would require the same issues to be litigated in two places'") (quoting Liaw Su Teng v. Skaarup Shipping Corp., 743 F.2d 1140, 1148 (5th Cir. 1984)).

In concluding, we stress that this appeal comes to us at the motion to dismiss stage. If the District Court determines on remand that a transfer is in the interest of justice,[20] it is our view that the court in the District of Colorado will not be bound either procedurally or substantively by our prima facie finding of personal jurisdiction. Rather, the court may decide upon ordering jurisdictional discovery that it in fact lacks personal jurisdiction over Pilatus on the basis of a more complete evidentiary record.

## V. CONCLUSION

In accordance with our foregoing analysis, we will affirm

---

[20]The District Court may consider factors beyond the jurisdictional point we have noted in making its interest of justice analysis.

the District Court's decision that Pennsylvania lacked personal jurisdiction over Pilatus, we will vacate its denial of appellants' motion to transfer the action to Colorado, and we will remand the case to the District Court for further proceedings consistent with this opinion, including a determination as to whether such transfer would be in the interest of justice and whether a severance is in order.